221 F.3d 376 (2nd Cir. 2000)
 VERMONT RIGHT TO LIFE COMMITTEE, INC., Plaintiff-Appellant,
v.
WILLIAM H. SORRELL, in his official capacity as Vermont Attorney General; JOHN T. QUINN, in his official capacity as Vermont State's Attorney; WILLIAM WRIGHT, in his capacity as Vermont State's Attorney; DALE O. GRAY, in his/her official capacity as Vermont State's Attorney; JAN PAUL, in his/her official capacity as Vermont State's Attorney; LAUREN BOWERMAN, in her official capacity as Vermont State's Attorney; JAMES HUGHES, in his official capacity as Vermont State's Attorney; LINDA P. EFFEL, in her official capacity as Vermont State's attorney; JOEL W. PAGE, in his official capacity as Vermont State's Attorney; JAMES D. MCNIGHT, in his official capacity as Vermont State's Attorney; JANE WOODRUFF, in her official capacity as Vermont State's Attorney; JAMES P. MONGEON, in his official capacity as Vermont State's Attorney; TERRY TRONO, in his/her official capacity as Vermont State's Attorney; DAN DAVIS, in his official capacity as Vermont State's Attorney; PATRICIA ZIMMERMAN, in her official capacity as Ver
mont State's Attorney; JAMES F. MILNE, in his official capacity as Vermont Secretary of State; EDWARD W. HAASE, in his official capacity as Vermont Commissioner of Taxes, Defendants-Appellees,
VERMONT PUBLIC INTEREST RESEARCH GROUP; COMMON CAUSE/VERMONT; LEAGUE OF WOMEN VOTERS OF VERMONT; RURAL VERMONT; SETH BONGARTZ; CHERYL RIVERS; MARJORIE POWERS, Intervenors-Defendants-Appellees.
 Docket No. 98-9325
August Term, 1998
 UNITED STATES COURT OF APPEALS
SECOND CIRCUIT
 Argued May 5, 1999
Decided June 15, 2000
Amended July 21, 2000
 
 Appeal from a judgment of the United States District Court for the District of Vermont (William K. Sessions III, Judge) granting summary judgment to the defendants and the intervenors in an action brought by the Vermont Right to Life Committee, Inc., seeking a declaratory judgment that three sections of a Vermont campaign finance law are facially unconstitutional under the First Amendment, and an injunction barring the defendants from enforcing them.
 Reversed and remanded. [Copyrighted Material Omitted]
 JAMES B. BOPP, JR., Bopp, Coleson & Bostrom, Terre Haute, IN (Glenn Willard, Bopp, Coelson & Bostrom, Terre Haute, IN, on the brief; Norman C. Smith, Bauer, Anderson & Gravel, Burlington, VT, of counsel), for Plaintiff-Appellant.
 TIMOTHY B. TOMASI, Assistant Attorney General of the State of Vermont, Montpelier, VT (William H. Sorrell, Attorney General of the State of Vermont, Eve Jacobs-Carnahan, Assistant Attorney General of the State of Vermont, Montpelier, VT, on the brief), for Defendants-Appellees.
 JONATHAN S. ABADY, Emery, Cuti, Brinckerhoff & Abady, PC, New York, NY (Brenda Wright, John C. Bonifaz, National Voting Rights Institute, Boston, MA, on the brief; Peter F. Welch, Welch, Graham & Manby, Burlington, VT, of counsel), for Intervenors-Defendants-Appellees.
 Daniel Manatt, Washington, DC, submitted a brief in support of affirmance of the judgment of the district court for Amicus Curiae Public Disclosure, Inc.
 Before: JACOBS* and SACK, Circuit Judges, and SHADUR,**. District Judge.
 Judge Shadur dissents in a separate opinion.
 SACK, Circuit Judge:
 
 
 1
 The plaintiff, the Vermont Right to Life Committee, Inc. ("VRLC"), challenges the constitutionality of three provisions of Act No. 64, a law enacted by the State of Vermont in 1997 to reform its system of campaign financing. VRLC is a non-profit membership organization whose stated purpose is "to ac[h]ieve universal recognition of the sanctity of human life from conception to natural death by lawful means such as public education and promoting legislation." It brought an action in the United States District Court for the District of Vermont pursuant to 42 U.S.C. §1983 seeking a declaratory judgment that these three provisions are facially unconstitutional under the First Amendment, and an injunction barring the defendants various Vermont State officials sued in their official capacities (the "State") from enforcing them. Two of these provisions taken together require that all "political advertisements" disclose the identity of the person or entity paying for the advertisement and the candidate, party or political committee by or on whose behalf it was disseminated. See Vt. Stat. Ann. tit. 17, §§2881-2882. The third requires that those who make expenditures for "mass media activities" within thirty days of an election report those expenditures within twenty-four hours to the state and to any candidate whose name or likeness is "included in the activity."
 
 
 2
 After determining that it had federal jurisdiction over this action and declining to exercise its discretion to abstain, the district court (William K. Sessions III, Judge) concluded that all the challenged provisions were susceptible to limiting constructions that saved them from constitutional invalidity. The court therefore awarded summary judgment to the State and to the intervenors -- the Vermont Public Interest Research Group, Common Cause/Vermont, the League of Women Voters of Vermont, Rural Vermont, Seth Bongartz, Senator Cheryl Rivers, and Marjorie Power ("the Intervenors") -- dismissing the complaint. The court also denied a cross-motion by VRLC for summary judgment on its claim that the provisions violate the First Amendment.
 
 
 3
 We agree with the district court that it had jurisdiction to decide this case and find that it did not abuse its discretion when it declined to abstain from exercising its jurisdiction. We disagree, however, with its decision on the merits. No narrowing construction of §§2881, 2882 or 2883 available to the district court would save those statutory provisions from facial invalidity under the First Amendment as it applies to the States through the Fourteenth Amendment. No one has briefed or argued -- and we do not decide -- whether the portion of §§2881 and 2882 that is challenged in this case, and which we hold to be unconstitutional, is severable from the remainder of the statute. We therefore reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.
 
 BACKGROUND
 
 4
 In June 1997, Act No. 64, a bill designed to impose comprehensive reform on Vermont's system of campaign financing, became law. Act of June 26, 1997, No. 64, 1997 Vermont Acts & Resolves. The statute recites that it is a response to rising costs of running for state office, the influence of those who make large campaign contributions, and the effect of large campaign expenditures on what the Vermont General Assembly called the "[r]obust debate of issues, candidate interaction with the electorate, and public involvement and confidence in the electoral process." Id. §1(a). The Act changed Vermont's campaign finance system in several important respects. It provided public financing of campaigns for the offices of governor and lieutenant governor, limited campaign contributions and expenditures, amended the reporting requirements for candidates and contributors, and imposed disclosure and reporting requirements on, respectively, all "political advertisements" and "mass media activities." See id. §§2, 4-15. Only the political advertising and mass media activities provisions of this measure, codified at Vt. Stat. Ann. tit. 17, §§2881-2883, are at issue in this litigation.
 
 
 5
 Sections 2881 and 2882, the disclosure provisions, state:
 
 
 6
 § 2881. Definitions
 
 
 7
 As used in this subchapter, "political advertisement" means any communication, including communications published in any newspaper or periodical or broadcast on radio, television or over any public address system, placed on any billboards, outdoor facilities, buttons or printed material attached to motor vehicles, window displays, posters, cards, pamphlets, leaflets, flyers or other circulars, or in any direct mailing, which expressly or implicitly advocates the success or defeat of a candidate.
 
 
 8
 § 2882. Identification
 
 
 9
 All political advertisements shall contain the name and address of the person who paid for the advertisement. The advertisement shall clearly designate the name of the candidate, party or political committee by or on whose behalf the same is published or broadcast. In the case of printed or written matter, the name and address shall be printed or written large enough to be clearly legible, except that this shall not apply to buttons or any written or printed matter attached to or displayed on any motor vehicle.
 
 
 10
 Section 2883, the reporting provision, provides:
 
 
 11
 § 2883. Notice of expenditure
 
 
 12
 (a) For purposes of this section, "mass media activities" includes television commercials, radio commercials, mass mailings, literature drops and central telephone banks which include the name or likeness of a candidate for office.
 
 
 13
 (b) In addition to any other reports required to be filed under this chapter, a person who makes expenditures totaling $500.00 or more for mass media activities within 30 days of a primary or general election shall report such expenditures to the secretary of state, and to the candidate whose name or likeness is included in the activity, within 24 hours of making the expenditure. The report shall identify the person who made the expenditure with the name of the candidate involved in the activity and any other information relating to the expenditure that is required to be disclosed under the provisions of [other] subsections... of this title.
 
 
 14
 Violation of §2882 or § 2883 can result in imposition of a civil penalty of up to $10,000 for each infraction. Vt. Stat. Ann. tit. 17, §2806(b).
 
 
 15
 VRLC is a nonprofit Vermont corporation with local chapters at various locations in the state. According to its by-laws, it exists to "engage in educational, charitable, and scientific projects or purposes," including (1) "present[ing] fully detailed and factual information upon which individuals and the general public may make an informed decision about the various topics of fetal development, abortion, alternatives to abortion, euthanasia and infanticide"; (2) "promot[ing] respect for the worth and dignity of all human life, including the life of the unborn from the moment of conception"; and (3) "promot[ing], encourag[ing] and sponsor[ing] such amendatory and statutory measures which will provide protection for human life before and after birth, particularly for the defenseless, the incompetent, the impaired and the incapacitated." Toward these ends, VRLC distributes information regarding the positions of candidates for political office on various issues -- issues related to abortion in particular-- through its newsletter, the "Vermont Right to Life Review," and a voter information guide included in another newsletter, the "Vermonters for Life Newsletter." Both publications are mailed exclusively to VRLC's approximately 4,500 members. VRLC also operates booths at county fairs at which posters are displayed and pamphlets distributed. Although a separate political committee of VRLC endorses political candidates, that committee and its activities are not involved in this litigation.
 
 
 16
 On August 28, 1997, soon after Act No. 64 became law, VRLC filed suit in the district court pursuant to 42 U.S.C. §1983 seeking a declaratory judgment that §§2881, 2882 and 2883 of the Act are unconstitutional, and an injunction barring the State from enforcing them. Although VRLC had not been charged with violating those sections of the statute, it claimed that its activities failed to comply with the disclosure requirements of §§2881 and 2882 and the reporting requirements of §2883, and that it would cease publishing non-compliant "issue advocacy" communications unless and until the provisions were declared unconstitutional and the threat to it of civil sanctions under §2806(b) was thereby removed.
 
 
 17
 On October 27, 1997, the State moved to dismiss VRLC's complaint, urging "that the Court abstain from ruling on this matter until such time as the Vermont state courts have had the opportunity to construe this important state legislation," and arguing in the alternative that federal jurisdiction was lacking. On January 5, 1998, the district court denied the State's motion. The following month, after discovery was completed, VRLC moved for summary judgment. In May 1998, the State and the Intervenors cross-moved for summary judgment.
 
 
 18
 In an opinion and order dated September 9, 1998, the district court reiterated that VRLC had standing to bring suit and again rejected the State's argument that the court should abstain from hearing the case. See Vermont Right to Life Comm., Inc. v. Sorrell, 19 F. Supp. 2d 204, 209-12 & n.6 (D. Vt. 1998) [hereinafter "Vermont Right to Life"]. The district court concluded that §§2881, 2882, and 2883 were "readily susceptible" to limiting constructions that saved the provisions from constitutional infirmity. Id. at 214-16. Because none of VRLC's activities violated these provisions as construed, the district court granted summary judgment to the State and the Intervenors and denied VRLC's cross-motion. Id. at 216.
 
 
 19
 This appeal followed.
 
 DISCUSSION
 I. Standard of Review
 
 20
 We review the district court's grant of summary judgment de novo to determine whether there is any genuine issue as to a material fact that should have been submitted to a trier of fact and whether the moving party is entitled to judgment as a matter of law. See Retrofit Partners I, L.P. v. Lucas Indust., Inc., 201 F.3d 155, 159 (2d Cir. 2000). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
 
 II. Standing and Abstention
 
 21
 Before examining the merits of VRLC's constitutional challenge, we must first determine whether the district court correctly concluded that VRLC has standing to challenge the statutory provisions at issue and whether the district court acted within its discretion in refusing to abstain from exercising its jurisdiction.
 
 A. Standing
 
 22
 Article III, §2 of the United States Constitution restricts federal courts to deciding "Cases" and "Controversies." From this has emerged the doctrine of constitutional standing. Federal courts must determine at the threshold of every case whether "a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." Sierra Club v. Morton, 405 U.S. 727, 731 (1972); see also Warth v. Seldin, 422 U.S. 490, 498 (1975); United States v. Cambio Exacto, S.A., 166 F.3d 522, 526 (2d Cir. 1999). "It would violate principles of separation of powers for us to hear a matter that was not a case or controversy and therefore not delegated to the [federal] judiciary under Article III." Id. at 527; see also Allen v. Wright, 468 U.S. 737, 752 (1984).
 
 
 23
 We review legal questions relating to standing de novo and factual findings for clear error. See Comer v. Cisneros, 37 F.3d 775, 787 (2d Cir. 1994); Thompson v. County of Franklin, 15 F.3d 245, 249 (2d Cir. 1994). Applying this standard of review, we agree with the district court that VRLC has standing to challenge §§2881, 2882 and 2883.
 
 
 24
 "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472 (1982) (quoting Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979)); see also Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103 (1998). The threat of suit under the questioned statute may be injury enough. A plaintiff bringing a pre-enforcement facial challenge against a statute need not demonstrate to a certainty that it will be prosecuted under the statute to show injury, but only that it has "an actual and well-founded fear that the law will be enforced against" it. Virginia v. American Booksellers Ass'n, 484 U.S. 383, 393 (1988).
 
 
 25
 When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."
 
 
 26
 Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979) (quoting Doe v. Bolton, 410 U.S. 179, 188 (1973)). "[T]he alleged danger of th[e] statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." American Booksellers, 484 U.S. at 393.[1]
 
 
 27
 That VRLC faces the possibility of civil litigation rather than criminal prosecution here is of no moment. The fear of civil penalties can be as inhibiting of speech as can trepidation in the face of threatened criminal prosecution. See New York Times Co. v. Sullivan, 376 U.S. 254, 277 (1964). VRLC is at risk of a civil penalty of up to $10,000 for each infraction of the Vermont election law. That penalty's deterrence of VRLC's speech is palpable enough.
 
 
 28
 We turn then to the question of whether VRLC faces a "credible threat," Babbitt, 442 U.S. at 298, of being penalized for its speech. The State argues that any such fear is unreasonable because, as it interprets §§2881, 2882 and 2883, the statute does not reach the expressive activities in which VRLC wishes to engage.
 
 1. Sections 2881 and 2882
 
 29
 VRLC contends that it is at risk of penalties under §§2881 and 2882 because it is not in compliance with §2882's requirement that political advertisements "clearly designate the name of the candidate, party or political committee by or on whose behalf the same is published or broadcast." VRLC does not expressly advocate the election or defeat of particular candidates other than through its internal political committee, whose activities are not a subject of this litigation. Relying on the definition of "behalf" contained in Webster's New Collegiate Dictionary (1984), however, VRLC argues that because its communications "benefit," "advantage[]," and "interest[]" certain candidates, political committees and parties that adhere to the views contained in the VRLC communications, they may be said to be disseminated "on... behalf of" those candidates, committees and parties and therefore subject to the requirements of this provision.
 
 
 30
 The district court decided that under the "literal" interpretation of the phrase "on whose behalf" propounded by VRLC, §§2881 and 2882 "could apply to any of a number of types of communication that implicitly or impliedly advocate for the success or defeat of a candidate and are published in the interest of a candidate, political party or political committee" and therefore "could be applied to VRLC's described activities." Vermont Right to Life, 19 F. Supp. 2d at 211. Accordingly, the court concluded that VRLC had standing to challenge those provisions of the law. We agree. VRLC's publication of an advertisement, particularly at election time, supporting a viewpoint with which a candidate is associated or with which his or her opponent takes issue could easily be construed as having been published on behalf of the candidate.
 
 
 31
 The State and the Intervenors argue that the district court should have followed the "plain meaning" of "on behalf of" as meaning "as the agent or representative of." But while there may be other, perhaps even better, definitions of "on whose behalf," VRLC's is reasonable enough that it may legitimately fear that it will face enforcement of the statute by the State brandishing the definition proffered by VRLC.
 
 
 32
 The State also argues that VRLC's fear of suit could not possibly be well-founded because the State has no intention of suing VRLC for its activities. While that may be so, there is nothing that prevents the State from changing its mind. It is not forever bound, by estoppel or otherwise, to the view of the law that it asserts in this litigation. See Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir. 1999) (doctrine of "judicial estoppel" which prevents party from taking mutually exclusive positions in different litigation under some circumstances applies to assertions of factual positions); Vittitow v. City of Upper Arlington, 43 F.3d 1100, 1106 (6th Cir.) (there is no rule "that requires us to accept representations from [the prosecution's] counsel" (emphasis omitted)), cert. denied, 515 U.S. 1121 (1995); Kucharek v. Hanaway, 902 F.2d 513, 519 (7th Cir. 1990) (interpretation of statute offered by Attorney General is not binding because he may "change his mind...and he may be replaced in office"). But cf. Wisconsin Right to Life, Inc. v. Paradise, 138 F.3d 1183, 1185 (7th Cir.) (finding no well-founded fear to support standing where present state attorney general, and every past attorney general since 1976, had adhered to same interpretation of statute), cert. denied, 525 U.S. 873 (1998). In light of this uncertainty, the State's representation cannot remove VRLC's reasonable fear that it will be subjected to penalties for its planned expressive activities. If we held otherwise, we would be placing VRLC's asserted First Amendment rights "at the sufferance of" Vermont's Attorney General. North Carolina Right to Life, Inc. v. Bartlett, 168 F.3d 705, 711 (4th Cir. 1999), cert. denied, 120 S. Ct. 1156 (2000); see also Stenberg v. Carhart, U.S. 120 S. Ct. 2597,2614-15, L.Ed.2d (2000). American Booksellers, 484 U.S. at 395 (1988) ("[A]s the Attorney General does not bind the state courts or local law enforcement authorities, we are unable to accept her interpretation of the law as authoritative."); North Carolina Right to Life, Inc., 168 F.3d at 710 (declining in absence of agency rule to rely on "State's litigation position" that it does not interpret statute to apply to issue advocacy). But cf. Graham v. Butterworth, 5 F.3d 496, 499 (11th Cir. 1993) (dismissing First Amendment challenge to state statute as moot after defendants withdrew initial determination that plaintiffs' conduct violated statute and informed plaintiffs that their intended campaign conduct would not be prosecuted).
 
 2. Section 2883
 
 33
 VRLC also claims that it has standing to challenge §2883, which imposes reporting requirements on expenditures of $500 or more on "mass media activities" conducted within 30 days of an election. VRLC asserts that, inter alia, its distribution of literature and display of posters at county-fair booths is subject to the reporting requirements of §2883 when these materials contain the name or likeness of a candidate. The district court agreed, and thus determined that VRLC had standing to challenge §2883. We also agree.
 
 
 34
 Section 2883(a) defines "mass media activities" by way of example: "For purposes of this section, 'mass media activities' includes television commercials, radio commercials, mass mailings, literature drops and central telephone banks which include the name or likeness of a candidate for office." The State and the Intervenors argue that the one essential characteristic shared by all of these examples is that they all involve communications "widely disseminated to the general public." VRLC's fair-booth activities share that characteristic. The district court found that in 1997, 306,600 people attended the Champlain Valley Fair in Chittenden County, where VRLC had a booth at which it distributed copies of its voting guide and most recent newsletter. See Vermont Right to Life, 19 F. Supp. 2d at 211 n.5. This, the district court noted, is more than twice Chittenden County's total population, which the district court placed at approximately 132,000. See id. at 211 n.5. Assuming that VRLC's communications at the Champlain Valley Fair reach only a small percentage of the number of people who attend it, that is still sufficient for VRLC reasonably to fear that its communications will be held to constitute "mass media activity."
 
 
 35
 The State also argues that VRLC's fair-booth activities, even if they are "mass media activities," do not meet §2883's provision that only expenditures of at least $500 are subject to its reporting requirements. VRLC has offered uncontradicted evidence, however, that it spent in excess of $600 in disseminating written material at the 1997 Champlain Valley Fair. VRLC thus has standing to challenge §2883.
 
 B. Abstention
 
 36
 In Railroad Commission of Texas v. Pullman Co., 312 U.S. 496 (1941), the Supreme Court counseled federal courts to "'abstain from decision when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided.'" Alliance of American Insurers v. Cuomo, 854 F.2d 591, 601 (2d Cir. 1988) (quoting Hawaii Housing Auth. v. Midkiff, 467 U.S. 229, 236 (1984)). We review for abuse of discretion the district court's decision not to abstain, bearing in mind that "there is little or no discretion to abstain in a case which does not meet traditional abstention requirements," Bethpage Lutheran Serv., Inc. v. Weicker, 965 F.2d 1239, 1244-45 (2d Cir. 1992) (internal quotation marks omitted), and that "[t]he underlying legal questions . . . are subject to plenary review," In re Joint Eastern & Southern Dist. Asbestos Litig., 78 F.3d 764, 775 (2d Cir. 1996) (internal quotation marks omitted). See also Harman v. Forssenius, 380 U.S. 528, 534 (1965) (district court's decision not to abstain reviewed for abuse of discretion).
 
 
 37
 Abstention under the Pullman doctrine may be appropriate when three conditions are met: (1) an unclear state statute is at issue; (2) resolution of the federal constitutional issue depends on the interpretation of the state law; and (3) the law is susceptible "to an interpretation by a state court that would avoid or modify the federal constitutional issue." Greater New York Metro. Food Council v. McGuire, 6 F.3d 75, 77 (2d Cir. 1993) (per curiam). Satisfaction of all three criteria does not automatically require abstention, however. "The doctrine of abstention...is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813 (1976) (quoting County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188 (1959)); Alliance of American Insurers, 854 F.2d at 599 ("[W]hen federal jurisdiction is proper, abstention is the exception, not the rule.") (citing Colorado River, 424 U.S. at 813).
 
 
 38
 Thus, "[t]he abstention doctrine is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers." Baggett v. Bullitt, 377 U.S. 360, 375 (1964); see also Ferran v. Town of Nassau, 11 F.3d 21, 23 (2d Cir. 1993); Moe v. Dinkins, 635 F.2d 1045, 1046 (2d Cir. 1980) (abstention should be utilized "with strict circumspection"). In deciding how to exercise this discretion, federal courts are instructed to engage in "'a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction.'" Young v. United States Dep't. of Justice, 882 F.2d 633, 644 (2d Cir. 1989) (quoting Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 16 (1983)). We have said that "important federal rights" can "outweigh[]" the interests underlying the Pullman doctrine. United Fence & Guard Rail Corp. v. Cuomo, 878 F.2d 588, 593 (2d Cir. 1989).
 
 
 39
 In this case, the district court relied on several factors in declining to abstain. At the outset, it determined that two of the Pullman doctrine's three prerequisites had not been satisfied, because the statutory provisions at issue were not unclear and any interpretation given them by the Vermont state courts would not avoid the constitutional questions raised. And it based its ruling from the bench at the hearing on the motion to dismiss, and again in its opinion disposing of the parties' summary judgment motions, in part on the lack of a certification procedure in Vermont, the delay that would result from abstention, the absence of a pending state action, and "the swift approach of an election season." Vermont Right to Life, 19 F. Supp. 2d at 212 n.6. We agree with the district court that abstention is not warranted, although for somewhat different reasons.
 
 
 40
 We recognized in Bad Frog Brewery, Inc. v. New York State Liquor Auth., 134 F.3d 87, 93-94 (2d Cir. 1998), that district courts must exercise particular caution before abstaining where a plaintiff has raised a facial constitutional challenge to a statute and the attendant delay would work to inhibit exercise of the First Amendment freedoms injured by the statute's existence. "In the context of First Amendment claims, Pullman abstention has generally been disfavored where state statutes have been subjected to facial challenges." Id. at 94; see also City of Houston, Texas v. Hill, 482 U.S. 451, 467 (1987) ("[W]e have been particularly reluctant to abstain in cases involving facial challenges based on the First Amendment."); Dombrowski v. Pfister, 380 U.S. 479, 489 490 (1965) ("[A]bstention... is inappropriate for cases [where]... statutes are justifiably attacked on their face as abridging free expression."). "[T]o force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect." Zwickler v. Koota, 389 U.S. 241, 252 (1967). "Given the importance and immediacy of the problem, and the delay inherent in referring questions of state law to state tribunals, it is evident that the District Court did not abuse its discretion in refusing to abstain." Harman, 380 U.S. at 537 (footnote omitted).
 
 
 41
 The costs of delay may be somewhat attenuated in situations where a state action is already pending. But no case involving §§2881, 2882, or 2883 is or has been pending in state court. VRLC has already stopped producing "political advertisements" that it reasonably believes fall within the disclosure requirements of §2882; VRLC's executive director has testified that since Act No. 64 became effective VRLC has ceased identifying "any candidates in any way in [its] newsletter to the best of [its] ability," and has "not published the results of any floor votes, as [it] normally would have done." And any further delay would result in the inhibition of "mass media activities" as defined by §2883 that VRLC may be considering for the coming election season. We therefore find no abuse of discretion in the district court's decision to exercise its jurisdiction in this case.
 
 
 42
 III. Constitutionality of §§2881, 2882 and 2883
 
 A. The Buckley Standard
 
 43
 VRLC, the State and the Intervenors are in essential agreement that the disclosure provisions of §§2881 and 2882 and the reporting provisions of §2883 are necessarily unconstitutional unless they apply only to advertising and "mass media activities" "that expressly advocate the election or defeat of a clearly identified candidate." Buckley v. Valeo, 424 U.S. 1, 80 (1976) (per curiam). This limitation reflects the Supreme Court's concern, first expressed as to the disclosure provisions of the Federal Election Campaign Act, that because such requirements "can seriously infringe on privacy of association and belief guaranteed by the First Amendment," id. at 64, they must be specifically directed to "[t]he governmental interests sought to be vindicated," id. at 66. The Court adopted the "express advocacy standard" to insure that these regulations were neither too vague, see id. at 76-79, nor intrusive on protected "issue discussion," id. at 79. Even a casual reading of §§2881 and 2882's disclosure requirements, which apply to communications that "expressly or implicitly advocate[] the success or defeat of a candidate" (emphasis added), and §2883, which mandates immediate reporting to the state and a candidate for office of "expenditures totaling $500.00 or more for mass media activities [as defined to include specified communications that 'include the name or likeness of [that] candidate'] within 30 days of a primary or general election," makes plain that each can be read to cover communications that constitute protected issue advocacy.
 
 
 44
 The question, then, is whether a narrowing construction can be applied to either set of provisions to rescue it from facial invalidity on the First Amendment grounds raised by VRLC. For a federal court to adopt such a narrowing construction of a state statute, "the statute must be 'readily susceptible' to the limitation; we [may] not rewrite a state law to conform it to constitutional requirements." American Booksellers, 484 U.S. at 397 (citing Erznoznik v. City of Jacksonville, 422 U.S. 205 (1975), and Broadrick v. Oklahoma, 413 U.S. 601 (1973)); see also Stenberg, 120 S.Ct. at 2616-17; Boos v. Barry, 485 U.S. 312, 330,108 S.Ct. 1157,99 L.Ed.2d 333 (1988)("[F]ederal courts are without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent."). We conclude that, contrary to the view of the district court, neither §§2881, 2882 nor 2883 admits of such a limiting construction.
 
 B. Sections 2881 and 2882
 
 45
 Section 2882 imposes disclosure requirements on "[a]ll political advertisements," which §2881 defines as "communication[s]...which expressly or implicitly advocate[] the success or defeat of a candidate." The district court concluded that regulation of "communications that impliedly advocate for or against a candidate" would run afoul of the Buckley test. Vermont Right to Life, 19 F. Supp. 2d at 214. We agree. The term "implicitly" in §2881 extends the reach of §§2881 and 2882's disclosure requirement to advocacy with respect to public issues, which is a violation of the rule enunciated in Buckley and its progeny. See, e.g., Nixon v. Shrink Missouri Gov't PAC, 120 S. Ct. 897 (2000); McIntyre v. Ohio Elections Comm'n, 514 U.S. 334 (1995); FEC v. Massachusetts Citizens for Life, Inc., 479 U.S. 238 (1986).
 
 
 46
 Indeed, VRLC identifies an additional constitutional problem posed by §§2881 and 2882: They are impermissibly vague. The word "implicitly" "fails to clearly mark the boundary between" what is "permissible and impermissible." Buckley, 424 U.S. at 41. A person seeking to communicate his or her point of view on a public issue-- to engage in classic issue advocacy-- cannot know in advance whether the State will read the communication to be an implicit endorsement of a candidate who, to a greater or lesser extent, agrees with or supports actions that conform to the speaker's view and will therefore be subject to penalty under the statute.
 
 
 47
 The constitutional defects in §§2881 and 2882 are particularly serious because of their impact on anonymous communications, which have played a central role in the development of free expression and democratic governance. See McIntyre, 514 U.S. at 341 ("'Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind.'" (quoting Talley v. California, 362 U.S. 60, 64 (1960))). Mandatory disclosure requirements may represent a greater intrusion into the exercise of First Amendment rights of freedom of speech and association than do reporting provisions like those that were at issue in Buckley. See McIntyre, 514 U.S. at 355 ("Though... mandatory reporting undeniably impedes protected First Amendment activity, the intrusion is a far cry from compelled self-identification on all election-related writings.").
 
 
 48
 The district court therefore sought a narrowing construction for the word "implicitly" that would remove from the reach of those provisions certain speech that is without question constitutionally immune. In that pursuit, the court observed that while one meaning of "implicitly" is "something capable of being understood although not directly expressed ('implied')," Vermont Right to Life, 19 F. Supp. 2d at 214 (citations omitted),[2] it also means "being without doubt or reservation ('unquestioning'),'" id. (citations omitted).[3] On the theory that legislatures are presumed to know the law and that courts should therefore attempt to interpret a statute in a way that saves the statute from constitutional deficiency, see United States ex rel. Attorney General of the United States v. Delaware & Hudson Co., 213 U.S. 366, 407 (1909), the district court chose the second meaning of the word for §2881. The court thus read §2881's language, "which expressly or implicitly advocates the success or defeat of a candidate," to apply only to communications that expressly or without doubt or reservation advocate the victory or defeat of a candidate. The court held that the statute, so construed, applies only to express advocacy on behalf of candidates and is therefore constitutional.
 
 
 49
 We think that the word "implicitly" is, in the context of this statute, not "readily susceptible" to that reading. American Booksellers, 484 U.S. at 397 (internal quotation marks omitted). For whatever "implicit" may mean standing alone, when paired with "express," as it is in §2881,[4] "implicit" means "tacit" or "capable of being inferred" or "not explicit" or "not express." Black's Law Dictionary's definition of "implied" is on the mark:
 
 
 50
 implied, adj. Not directly expressed; recognized by law as existing inferentially.
 
 
 51
 Black's Law Dictionary, 757 (7th ed. 1999). Unsurprisingly, we have neither been directed to nor ourselves found an example of a court or legislature using the phrase "expressly or implicitly" to mean "explicitly or without doubt." The phrase is commonly used to mean "expressly or tacitly."[5]
 
 
 52
 The obvious and only purpose for the Vermont General Assembly's use of the word "implicitly" in §2881 was to make clear that all communications that advocate the success or defeat of a candidate, including issue advocacy that implicitly endorses a candidacy, come within the disclosure requirements. The provision cannot be saved by construction from violating the First Amendment. Cf. North Carolina Right to Life, Inc., 168 F.3d at 712 (declining to read the word "incidental" out of a statute, in which "political committee" was defined as a group "the primary or incidental purpose of which is to support or oppose any candidate or political party or to influence or attempt to influence the result of an election," in order to save its constitutionality).
 
 
 53
 The phrase "or implicitly" may, however, be severable from the rest of §§2881 and 2882. Whether it is a matter governed by state law. See Watson v. Buck, 313 U.S. 387, 395 96 (1941); National Adver. Co. v. Town of Niagara, 942 F.2d 145, 148 (2d Cir. 1991). Under Vermont law,
 
 
 54
 Where a part of a statute is unconstitutional, that fact does not authorize courts to declare the remainder void also, unless all the provisions are connected in subject-matter, depending on each other, operating together for the same purpose, or otherwise so connected together in meaning that it cannot be presumed the Legislature would have passed the one without the other.
 
 
 55
 State v. Scampini, 77 Vt. 92, 121, 59 A. 201, 211 (1904); see also City of Burlington v. New York Times Co., 148 Vt. 275, 282, 532 A.2d 562, 566 (1987) ("[O]nly those portions of a statute or ordinance which fully operate as law apart from the portion declared invalid may be severed.") (citing Scampini). But cf. Sargent v. Rutland R. Co., 86 Vt. 328, 338, 85 A. 654, 658 (1913) ("[W]hen... the provisions of the statute are clothed in plain language, and unambiguous, there is no room for construction.").
 
 
 56
 This issue was apparently neither briefed in nor considered by the district court. It was not briefed or argued to us. We therefore direct the district court, on remand, to analyze the issue of severability in the first instance and to fashion a declaratory judgment and injunction in accordance with the results of that analysis. We neither consider nor decide whether severing the phrase "or implicitly" would render the statute constitutional.
 
 C. Section 2883
 
 57
 We turn finally to §2883, which requires the reporting of all expenditures of $500 or more for "mass media activities," defined to include "television commercials, radio commercials, mass mailings, literature drops and central telephone banks which include the name or likeness of a candidate for office" occurring within thirty days of a primary or general election. The reports are to be rendered to the state and to the identified candidate within twenty-four hours after the expenditure is made.
 
 
 58
 Like §§2881 and 2882, without a limiting construction, §2883 is unconstitutional on its face. The section apparently requires reporting of expenditures on radio or television advertisements[6] devoted to pure issue advocacy in violation of the clear command of Buckley. See Buckley, 424 U.S. at 80. Under the plain terms of § 2883, for example, VRLC would be required to report expenditures exceeding $500 on an advertisement about a law or proposal popularly known by the name of a legislator who happened to be seeking re-election. Similarly, expenditures on advertisements urging people to contact a candidate, or publicizing a news item containing the candidate's name, would have to be reported under § 2883 even if the advertisement does not expressly advocate the election or defeat of the candidate. Because of this broad reach, we agree with the district court that § 2883 is unconstitutional under Buckley.
 
 
 59
 Having correctly concluded that §2883's plain language rendered the section constitutionally impermissible, the district court attempted to save it by narrowly construing the term "expenditure" to mean "'funds used for communications that expressly advocate the election or defeat of a clearly identified candidate.'" Vermont Right to Life, 19 F. Supp. 2d at 215 (quoting Buckley, 424 U.S. at 80). The district court decided that "[t]his construction is reasonable, because it is consistent with Buckley's construction of 'expenditure' in a similar context." Id. In Buckley, the Supreme Court saved 2U.S.C. §434(e), which imposed reporting requirements on "expenditures" by non-candidates for "the purpose of...influencing" nominations or elections with respect to federal office from constitutional invalidity by construing "expenditures" "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." Buckley, 424 U.S. at 80 (footnote omitted).
 
 
 60
 But the statutory definition of expenditure in §2883 is broader than the provisions of 2 U.S.C. § 434(e) with which the Supreme Court dealt in Buckley. Under § 434(e), donors were required to report expenditures made "for the purpose of... influencing" the nomination or election of a person to federal office. The Supreme Court saved the provision by limiting this "purpose" provision to reach only "funds for communication that expressly advocate the election or defeat of a clearly identified candidate." Buckley, 424 U.S. at 80. Section2883, by contrast, compels reporting of expenditures on "mass mailing activities," which include "television commercials, radio commercials, mass mailings, literature drops and central telephone banks which include the name or likeness of a candidate for office." There is no "purpose" requirement linking the section to election-related activity. Thus, to confine §2883 within Buckley-established bounds successfully, a court would have to read into it both a purpose requirement -- to influence the nomination or election of a person to office -- and a narrow meaning of the word "expenditure" -- "funds used for communications that expressly advocate" that nomination or election. This compound process is substantially more involved -- a significantly greater reach -- than that engaged in by the Buckley Court.
 
 
 61
 The disclosure requirements in §2883(b), moreover, incorporate by reference not only the definition of "mass media activities" in §2883(a), but also the definition of "expenditure" in Vt. Stat. Ann. tit. 17, § 2801(3). "Expenditures" are defined by § 2801(3) to mean payments made "for the purpose of influencing an election, advocating a position on a public question, or supporting or opposing one or more candidates" (emphasis added). Any attempt to save §2883 would at least require a court to: (1) interpret the phrase "supporting or opposing one or more candidates" to mean "supporting or opposing one or more candidates expressly"; and (2) interpret the phrase "advocating a position on a public question" to mean "advocating a position on a public question solely by means of expressly advocating the election or defeat of a clearly identified candidate." Since the last phrase in § 2801(3) is a plain reference to issue advocacy, it can hardly be said to be "readily apparent" that its meaning excludes issue advocacy.
 
 
 62
 At the same time that a more radical procedure would be required to save §2883 than was needed for § 434(e) in Buckley, the ability of the district court to employ a narrowing construction here is more limited than it was in Buckley. The Court in Buckley was interpreting a federal statute. It was therefore operating under a broad charge: to save the statute's constitutionality if it could through a "fairly possible" limiting construction of the statutory language, see, e.g., Concrete Pipe & Prods. v. Construction Laborers Pension Trust, 508 U.S. 602, 629 (1993) (quoting Machinists v. Street, 367 U.S. 740, 749-750 (1961) (quoting Crowell v. Benson, 285 U.S. 22, 62 (1932))), so long as that reading was not "plainly contrary to the intent of Congress," id. (quoting Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council, 485 U.S. 568, 575 (1988)). See Boos, 485 U.S. at 330-31 (rejecting the argument that the court of appeals' construction of a statutory provision was not "readily apparent" on the grounds that the statute had been enacted by Congress and "[i]t is well settled that federal courts have the power to adopt narrowing constructions of federal legislation."). For reasons we have discussed, in interpreting a state statute, by sharp contrast, the district court here could only give §2883 a reading that was "readily apparent." That "expenditures ... for mass media activities" means "'funds used for communications that expressly advocate the election or defeat of a clearly identified candidate,'" Vermont Right to Life, 19 F. Supp. 2d at 215, is hardly "readily apparent."
 
 
 63
 There is, meanwhile, reason to think that when the Vermont legislature said "expenditures ... for mass media activities" it meant all "expenditures," not only "funds used for communications that expressly advocate the election or defeat of a clearly identified candidate" under Buckley. We have seen in the course of our analysis of §§2881 and 2882 that the General Assembly was willing to attempt to regulate advertising that "implicitly advocates the success or defeat of a candidate" despite Buckley's clear mandate to the contrary. There is therefore no reason for us to think that when the General Assembly came to consider §2883, it then intended to follow, rather than test or ignore, principles established by Buckley, through the use of the word "expenditure" to exclude expenditures for issue advocacy.
 
 
 64
 In Virginia Soc'y for Human Life, 152 F.3d 268 (4th Cir. 1998), the Fourth Circuit considered a Virginia statute that required certain people or organizations that spent money "for the purpose of influencing the outcome of any election," id. at 269 (quoting Va. Code Ann. § 24.2-901), to, inter alia, report their expenditures, see id. (quoting Va. Code Ann. § 24.2-1014). The plain language of the statute suggested that it applied to issue advocacy contrary to Buckley. See id. The court of appeals disapproved the district court's narrowing construction of the words "for the purpose of influencing the outcome of any election" to exclude issue advocacy in an effort to conform the statute to the Buckley requirements. See id. at 270. The reviewing court reached that conclusion in part because of the limited nature of such a review of a state statute by a federal court -- only if such a reading was readily apparent would it survive. But also, "[i]n fact, a de novo review of the text, structure and history of the election laws at issue suggested to [the court] that they did apply to issue advocacy" contrary to Buckley. Id. We likewise find that in light of the text, structure and history of Vermont's §2883, the narrowing reading of the provision given to it by the district court was unwarranted.
 
 
 65
 We conclude that the district court erred in granting summary judgment for the defendants and in failing to enter an injunction forbidding the enforcement by the defendants of the provisions of §2883.[7]
 
 CONCLUSION
 
 66
 We hold that no saving construction of §§2881, 2882 or 2883 is "readily apparent" and that for the reasons set forth above they are therefore facially invalid under the First Amendment. We reverse the district court's judgment and remand the case to the district court for it (i) to determine whether the words "or implicitly" in §2881 may and should be severed from the remainder of §§2881 and 2882, (ii) to determine whether a certification to the Vermont Supreme Court with respect to the meaning of the statutory provisions in issue is appropriate and advisable, and (iii) to enter a judgment or judgments and injunction or injunctions otherwise in accordance with this opinion. The mandate shall issue forthwith.
 
 
 
 Notes:
 
 
 *
 Judge Cabranes, who sat on the panel that originally heard this appeal, recused himself shortly after the original majority opinion was filed. Judge Jacobs was designated by the Chief Judge to take Judge Cabranes's place on the panel pursuant to 2d Cir. R. 0.14(b).
 
 
 **
 The Honorable Milton I. Shadur, of the United States District Court for the Northern District of Illinois, sitting by designation.
 
 
 [1]
 For purposes of constitutional standing, there is no requirement that a plaintiff challenging the facial validity of a state statute first raise its claim in state court. See American Booksellers, 484 U.S. at 392-93 (adjudicating in federal court an initial challenge to the constitutionality of a Virginia statute banning the display of sexually explicit material accessible to juveniles); see also Babbitt, 442 U.S. at 298-99 (finding that plaintiffs enjoyed constitutional standing to challenge in federal court the constitutionality of certain provisions of Arizona's statutory scheme for the regulation of agricultural employment relations).
 
 
 [2]
 "[C]apable of being understood from something else though unexpressed," Merriam Webster's Collegiate Dictionary 583 (10th ed. 1997); see also Bergen Evans & Cornelia Evans, A Dictionary of Contemporary American Usage 115 (1957) ("Anything is implicit which is implied without being stated.").
 
 
 [3]
 See generally Wilson Follett, Modern American Usage: A Guide 174 (1966) (referring to implicit and explicit and stating, "[b]oth words can exert the same force and approach the same meaning"). But cf. H.W. Fowler, A Dictionary of Modern English Usage 270 (2d ed. 1965) ("The human mind likes a good clear black and white contrast; when two words so definitely promise one of these contrasts as do explicit and implicit, and then dash our hopes by figuring in phrases where the contrast ceases to be visible -- say in 'explicit support' and 'implicit obedience', with absolute or complete or full as a substitute that might replace either or both -- we ask with some indignation whether after all black is white, and perhaps decide that implicit is a shifty word with which we will have no further dealings.").
 
 
 [4]
 "Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used . . . ." NLRB v. Federbush Co., 121 F.2d 954, 957 (2d Cir. 1941) (L. Hand, J.).
 
 
 [5]
 While a computerized search can be framed in any number of different ways, according to our search conducted in early April 2000:
 The Vermont State legislature has twice used the word "implicitly" with "explicitly," each time in the course of defining sexual harassment and each time employing "implicitly" to mean "to be inferred" or "not explicitly" rather than "without doubt." See Vt. Stat. Ann. tit. 16, § (a)(26)(A) ("Submission to . . . conduct made either explicitly or implicitly a term or condition of a student's education"); Vt. Stat. Ann. tit. 21, § 495d(13)(B) (same, substituting "employment" for "a student's education.").
 The Vermont Supreme Court has, in the past decade, twice used the word "express" or "expressly" directly in tandem with the word "implicit" or "implicitly." On both occasions "implicit" or "implicitly" meant "tacit" or "tacitly" rather than "without doubt." See Titchenal v. Dexter, 166 Vt. 373, 383, 693 A.2d 682, 688 (1997) ("Typically the decedent obtained custody by expressly or implicitly promising the child, the child's natural parents, or someone in loco parentis that an adoption would occur."); Clymer v. Webster, 156 Vt. 614, 624, 596 A.2d 905, 911 (1991) ("[T]he amendment neither expressly nor implicitly precludes a plaintiff who is seeking compensation for the death of an adult child from showing that, under the circumstances of a particular case, he or she is entitled to loss-of-companionship damages."). During the same time period, the court used "implicitly" or "implicit" in close proximity to "explicit" or "explicitly" 16 times in opinions. Again, on each occasion, "implicit" or "implicitly" has meant "tacit" or "tacitly" rather than "without doubt."
 Our own Court has used "express," "expressly," "explicit" or "explicitly" in conjunction with the word "implicit," or "implicitly," 110 times in published opinions (including dissents) over the last ten years, each time using "implicit" or "implicitly" to mean "tacit" or "tacitly" rather than "without doubt."
 Cf. Alex Kozinski & Stuart Banner, Response: The Anti-History and Pre-History of Commercial Speech, 71 Tex. L. Rev. 747, 756 n.37 (1993) ("Ah, the wonders of Lexis."). We refrain from burdening this opinion or the Federal Reporter (3d Series) with the 126 case citations (other than Titchenal and Clymer) referred to above. All are available on Lexis and Westlaw.
 
 
 [6]
 The provision says that "mass media activities" include radio and television advertising, see § 2883(a), but does not state or otherwise imply that newspaper advertising is not covered.
 
 
 [7]
 As of December 31, 1999, long after the district court entered its judgment and the parties briefed and argued the matter before this Court, the Vermont Supreme Court promulgated Rule 14 of the Vermont Rules of Appellate Procedure. In an experiment to last at least two years, Rule 14 permits the Vermont Supreme Court to answer "a question of Vermont law certified to it by a court of the United States if the answer may be determinative of an issue in pending litigation in the certifying court and there are no clear controlling precedents in the decisions of the Vermont Court." V.R.A.P. 14. On remand, the district court may consider, among other matters and solely within its discretion, whether it would be appropriate to avail itself of this procedure with regard to: (1) the construction of § 2883; or (2) the severability of the unconstitutional portion of §§ 2881 and 2882 from the remainder of those provisions. We intimate no view as to whether the trial court should so exercise its discretion, but note that the district court is required to enjoin enforcement of these provisions during the pendency of any certification proceeding because we hold that, absent a limiting reading with respect to § 2883 and severance of the phrase "or implicitly" from the rest of §§ 2881 and 2882, the provisions are unconstitutional.
 
 
 
 67
 SHADUR, District Judge, dissenting from the majority opinion.
 
 
 68
 This dissent is occasioned not by any disagreement with the majority opinion's thoughtful and comprehensive substantive analysis of the disputed Vermont legislation, but rather by the sense that a negative answer should have been given in the first instance to the threshold question:
 
 
 69
 Is this trip necessary?
 
 
 70
 In my view, the complex federal constitutional principles that are addressed by the majority opinion have been brought into play in the federal courts needlessly--and more important, improperly by the Vermont Right to Life Committee, Inc. ("Committee").
 
 
 71
 Warning alarm signals should have gone off when the Committee first brought a District Court action for declaratory judgment as to the facial unconstitutionality of three state statutes of arguable meaning, without its having gone to the source that has the final word on the actual meaning of the statutory language. Under the circumstances of this case, I believe that the Committee lacked constitutional standing to come to the federal court system for that purpose.
 
 
 72
 As for Sections 2881 and 2882 of Title 17 of the Vermont statutes, nothing that the Committee actually does even arguably runs afoul of the statutory provisions, unless a really strained reading is given to the phrase "on whose behalf" an advertisement is published--a reading that the State of Vermont's representatives expressly disavow and that the majority opinion itself recognizes is not at all the most plausible reading of the statutory language. And although the majority is of course right in saying that the State's present intention not to sue the Committee for any of its actions could possibly change at some indefinite time in the future (there being no estoppel to prevent that), that point ignores the important factor that the State's present intention has always afforded, and still affords, the Committee a risk-free opportunity to get a definitive construction of the statute directly from the horse's mouth, rather than from the federal courts (whose reading of the statute the state courts are of course free to ignore if they want to). Indeed, even apart from the fact that the Committee could have (and should have) gone to the state courts to obtain without risk a definitive construction of the statute in the first instance rather than getting the federal courts' best (but wholly nonbinding) effort to discern its ultimate meaning--there is a special degree of irony in the fact that the majority opinion concludes by giving the district court the option of now seeking such a definitive reading under the newly adopted Vermont Supreme Court certification provision--almost three years after this suit was filed!
 
 
 73
 So the current situation--the absence of any "actual or threatened" injury to the Committee (as contrasted with the purely hypothetical prospect of injury at some undefined future time), plus the absence of any "conduct" on the part of the Vermont defendants (again as contrasted with a hypothetical future possibility)--brings squarely into play the principle quoted by the majority opinion from Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472 (1982), in turn quoting Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979):
 
 
 74
 [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant."
 
 
 75
 And that principle is of course still alive and well and living in Washington--as Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103 (1998) has succinctly stated the first of the three requirements contained in the "irreducible constitutional minimum of standing" (id. at 102):
 
 
 76
 First and foremost, there must be alleged (and ultimately proved) an "injury in fact"--a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.'"
 
 
 77
 Because the Committee's purported harm fails every one of those criteria--it neither is nor has been "concrete" nor "actual" nor "imminent"--my sense is that the consequent absence of an Article III case or controversy precludes the issuance of what amounts to an advisory opinion by the majority as to the statutes' meaning.
 
 
 78
 As for Section 2883, once more the majority is compelled to indulge what it must acknowledge to be an arguable--but by no means clear--construction of the statutory language in order to find a potential case or controversy. But once again the Committee has faced no actual injury, and it can identify only a fancied and not a real threat of injury stemming from the statutory provision. And once more, under those circumstances Valley Forge and Steel Co. teach the absence of a case or controversy and hence of Article III standing on the Committee's part.
 
 
 79
 By definition the absence of a case or controversy closes the federal courthouse doors to the Committee, so that there is no occasion to decide the appropriateness or inappropriateness of the type of discretionary declination known as Pullman abstention (Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496 (1941)). But even on that score, it also seems ironic that the majority opinion points to concerns about delay as a reason supporting the District Court's decision not to abstain (citing Bad Frog Brewery, Inc. v. New York State Liquor Auth., 134 F.3d 87, 93-94 (2d Cir. 1998)).[1]
 
 
 80
 This lawsuit was launched in August 1997, nearly three years ago. If the Committee has indeed sustained a chilling of its First Amendment freedoms (something that it has really failed to demonstrate), that wound would have to be recognized as wholly self-inflicted. After all, nothing at all prevented the Committee from bringing its action instead in the Vermont state courts, which could well within the same time frame have provided a definitive not merely a good faith--interpretation of the challenged statutes, and which are of course equally competent to apply federal constitutional doctrine to a statute so construed. In that regard, two decades ago Allen v. McCurry, 449 U.S. 90, 105 (1980) spoke disapprovingly of "a general distrust of the capacity of the state courts to render correct decisions on constitutional issues," instead repeating "this Court's emphatic reaffirmation...of the constitutional obligation of the state courts to uphold federal law, and its expression of confidence in their ability to do so." That of course remains as true today as it was then.
 
 
 81
 Indeed, one of the principal reasons for deferring to the state courts' opportunity to construe a state statute (and particularly one of questionable constitutionality) first is the accepted truism in constitutional jurisprudence that a state's Supreme Court, confronted with its legislature's use of the term "gray" in a statute that would render its constitutionality suspect, is free to say that the legislature meant "black"--or meant "white"--and can thus eliminate any such potential unconstitutionality. And no federal court is free to say nay, even if it views "black" or "white" as a total distortion of the statutory meaning or of the legislative intention or both.
 
 
 82
 In sum, I regret my inability to join the fine work product represented by the majority opinion, but that inability stems from the most fundamental of jurisprudential reasons. I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 Both the present case and the purely coincidental reference to the New York Liquor Authority in the decision just cited in the text have triggered a sense of deja vu for me. Well into my first decade in the law practice, I brought to the United States Supreme Court a challenge to an Alabama statute on the ground that, by prohibiting union membership among the employees of Alabama's state-owned liquor stores, it violated the employees' First Amendment rights of association. Despite the clarity of the Alabama statutory language in objective terms (a sharp contrast with the Vermont legislation at issue here), the Supreme Court in Government & Civic Employees Organizing Comm. v. Windsor, 353 U.S. 364, 367 (1957)(per curiam) still sent the case back to the district court "to retain jurisdiction until efforts to obtain an appropriate adjudication in the state courts have been exhausted." Unlike the situation here, the impact on the clients' rights in that case was unquestionably real and immediate--not hypothetical and a speculative future problem. So unlike the situation here, Article III presented no obstacle to standing and hence to federal jurisdiction, and yet the Supreme Court eschewed that jurisdiction in favor of giving the state judicial system the first opportunity to say what the statute meant.