10-4572-cv
National Organization for Marriage, Inc. v. Walsh

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2011

(Argued: August 24, 2011                              Decided: April 22, 2013)

Docket No. 10-4572-cv
_____

NATIONAL ORGANIZATION FOR MARRIAGE, INC.,

*Plaintiff-Appellant*,

-v.-

JAMES WALSH, in his official capacity as co-chair of the New York State Board of Elections,
DOUGLAS KELLNER, in his official capacity as co-chair of the New York State Board of
Elections, EVELYN AGUILA, in her official capacity as commissioner of the New York State
Board of Elections, GREGORY PETERSON, in his official capacity as commissioner of the New
York State Board of Elections,

*Defendants-Appellees*.
_____

Before:
            NEWMAN, HALL, *Circuit Judges*, PRESKA,[1] *Chief District Judge.*
            _____

Plaintiff-Appellant, a nonprofit advocacy organization, sued Defendants-Appellees,

officials of the New York State Board of Elections, seeking a declaratory judgment that the

"political committee" definition of New York Election Law § 14-100.1 violates the First

Amendment to the United States Constitution, and requesting preliminary and permanent

injunctions barring the enforcement of the law. The district court dismissed the case for lack of

_____

[1] Hon. Loretta A. Preska, of the United States District Court for the Southern District of
New York, sitting by designation.

subject-matter jurisdiction. We hold that Plaintiff's claims were ripe for adjudication and are not moot. We therefore vacate the judgment of the district court dismissing the case, and remand to the district court for further consideration. Judge Newman dissents in a separate opinion.

VACATED AND REMANDED.

_____

RANDY ELF (James Bopp, Jr., Jeffrey P. Gallant, Austin J. Hepworth, James Madison Center for Free Speech, *and* Laurence Behr, Barth Sullivan Behr, Buffalo, NY, *on the brief*), James Madison Center for Free Speech, Terre Haute, IN, *and as substitute counsel* Kaylan L. Phillips, ActRight Legal Foundation, Washington, DC, *and* John C. Eastman, Center for Constitutional Jurisprudence, Orange, CA, *for Plaintiff-Appellant*.

KENNETH A. MANNING (Michael B. Powers, Craig R. Bucki, *on the brief*) Phillips Lytle LLP, Buffalo, NY, *for Defendants-Appellees Douglas Kellner and Evelyn Aquila*.

Justin E. Driscoll, Brown & Weinraub, PLLC, Albany, NY, *for Defendants-Appellees James Walsh and Gregory Peterson*.

_____

Hall, *Circuit Judge*:

Plaintiff-Appellant the National Organization for Marriage ("NOM") appeals from the judgment of the United States District Court for the Western District of New York (Arcara, J.) dismissing its amended complaint for lack of subject-matter jurisdiction. Contrary to the district court, we hold that NOM pleaded a ripe "case or controversy" necessary to confer Article III jurisdiction. Prudential considerations related to ripeness do not bar review. Moreover, the case is not moot. We therefore vacate the judgment of the district court dismissing the case, and

remand for the district court to consider, in the first instance, whether to dismiss NOM's complaint on the merits.

## I. Background

On September 16, 2010, NOM filed its complaint in federal district court seeking a declaratory judgment that New York Election Law § 14-100.1, which defines the term "political committee" for the purposes of state elections, violates the First Amendment to the United States Constitution. NOM also requested a preliminary and a permanent injunction barring the enforcement of the law. In the complaint, which named as Defendants four members of the New York State Board of Elections in their official capacity, NOM identified itself as a "non-sectarian," "non-partisan," and "non-profit corporation."[2] Although the complaint itself did not describe NOM's mission, an exhibit attached to the complaint explained that NOM is dedicated to opposing same-sex marriage. In furtherance of that goal, NOM asserted that it would seek, in September and October 2010, "to engage in multiple forms of speech in New York," including direct mailings and television, radio, and internet advertisements.[3] NOM alleged that the threat of being labeled a "political committee" chilled this form of protected speech. Defendants moved to dismiss the complaint, arguing *inter alia* that NOM's claim was not ripe because the Board of Elections had not yet threatened any enforcement of the challenged election law provisions.

---

[2] Because the district court dismissed this case at the pleading stage, we recite the facts as found in NOM's complaint. Our review encompasses not only the complaint itself, but also "any documents attached thereto or incorporated by reference and documents upon which the complaint relies heavily." *Bldg. Indus. Elec. Contractors Ass'n v. City of N.Y.,* 678 F.3d 184, 187 (2012) (quotation marks omitted).

[3] Examples of these advertisements were attached as exhibits.

NOM, in response, filed a more developed amended complaint. The amended complaint alleged that NOM *sought* in September 2010 and *would seek* in October 2010 to directly advocate, by various means, for the election of certain candidates for state wide political office. NOM further asserted that it intended to engage in "materially similar" speech in "materially similar situations in the future." Although NOM disclaimed any intention to coordinate its express advocacy with any candidate or candidate committee or political party, or to contribute to any of these entities, NOM maintained that its express advocacy for candidates could render it a "political committee" for the purposes of § 14-100.1.

Section 14-100.1 provides, in full, that

"political committee" means any corporation aiding or promoting and any committee, political club or combination of one or more persons operating or co-operating to aid or to promote the success or defeat of a political party or principle, or of any ballot proposal; or to aid or take part in the election or defeat of a candidate for public office or to aid or take part in the election or defeat of a candidate for nomination at a primary election or convention, including all proceedings prior to such primary election, or of a candidate for any party position voted for at a primary election, or to aid or defeat the nomination by petition of an independent candidate for public office; but nothing in this article shall apply to any committee or organization for the discussion or advancement of political questions or principles without connection with any vote or to a national committee organized for the election of presidential or vice-presidential candidates; provided, however, that a person or corporation making a contribution or contributions to a candidate or a political committee which has filed pursuant to [New York Election Law §] 14-118 shall not, by that fact alone, be deemed to be a political committee as herein defined.

According to the amended complaint, and confirmed by affidavits the Defendants filed in connection with their opposition to NOM's motion for a preliminary injunction, "political committees" must: (1) file a registration statement and designate a treasurer, *see* N.Y. Elec. Law § 14-118; (2) maintain certain financial records, *see* §§ 14-102, 14-108, 14-122; and (3) make periodic reports based on these records to the Board of Elections disclosing, *inter alia*, contributions received and expenditures made, *see id.* §§ 14-102, 14-104. NOM feared that if it

4

failed to comply with these provisions of New York law, it would be subject to state civil and criminal liability. NOM also asserted (without explanation) that New York law "chills [it] from proceeding with its speech." As with the first complaint, NOM attached numerous exhibits to its complaint showing the type of mailings and broadcasts NOM wanted to propagate, declaring that it would engage in these activities "only if the [district c]ourt grants the requested relief."

The district court accepted NOM's amended complaint as a superseding pleading pursuant to Fed. R. Civ. P. 15(a)(1) and dismissed the case for lack of jurisdiction. The district court observed that the complaint did not allege that NOM had tried to ascertain its status with the Board of Elections, nor that the Board had attempted to enforce the "political committee" definition of § 14-100.1 against NOM. In the district court's view, this meant NOM's claims were not ripe because it had no "actual and well-founded fear that the law w[ould] be enforced against it." The court concluded by surmising "at least a notable chance" that NOM could avoid the political committee designation altogether by virtue of the savings clause of § 14-100.1, which exempts entities not involved with elections.[4]

## II. Discussion

We review *de novo* a district court's determination that it lacks subject-matter jurisdiction on ripeness grounds. *Connecticut v. Duncan*, 612 F.3d 107, 112 (2d Cir. 2010) ("A district court's ripeness determination is . . . a legal determination subject to *de novo* review.); *Nutritional Health Alliance v. Shalala*, 144 F.3d 220, 225 (2d Cir. 1998) ("Ripeness is a constitutional prerequisite to exercise of jurisdiction by the federal courts."). In addition, we have an independent duty to consider other aspects of subject-matter jurisdiction *nostra sponte*. *See Kalson v. Paterson*, 542 F.3d 281, 286 n.10 (2d Cir. 2008) ("The fact that neither party

_____

[4] The district court also denied NOM's motion for reconsideration, a judgment NOM does not appeal.

raised a jurisdictional issue on appeal is of no matter; we are obligated to determine whether

jurisdiction exists *nostra sponte*.").

A.    Ripeness

To be justiciable, a cause of action must be ripe—it must present "a real, substantial

controversy, not a mere hypothetical question." *AMSAT Cable Ltd. v. Cablevision of Conn.*, 6

F.3d 867, 872 (2d Cir. 1993).  Ripeness "is peculiarly a question of timing." *Thomas v. Union*

*Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985).  A claim is not ripe if it depends upon

"contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.*

at 580-81.  The doctrine's major purpose "is to prevent the courts, through avoidance of

premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v.*

*Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds by Califano v. Sanders*, 430

U.S. 99, 105 (1977).

"The ripeness doctrine is drawn both from Article III limitations on judicial power and

from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n v.*

*Dep't of Interior*, 538 U.S. 803, 808 (2003) (internal quotation marks omitted).  Thus, the

doctrine implicates two distinct conceptual jurisdictional criteria.  *Simmonds v. INS*, 326 F.3d

351, 356-57 (2d Cir. 2003).

> Both [criteria] are concerned with whether a case has been brought
> prematurely, but they protect against prematureness in different ways and for
> different reasons.  The first of these ripeness requirements has as its source the
> Case or Controversy Clause of Article III of the Constitution, and hence goes, in a
> fundamental way, to the existence of jurisdiction.  The second is a more flexible
> doctrine of judicial prudence, and constitutes an important exception to the usual
> rule that where jurisdiction exists a federal court must exercise it.
>
> These two forms of ripeness are not coextensive in purpose.
> Constitutional ripeness is a doctrine that, like standing, is a limitation on the
> power of the judiciary.  It prevents courts from declaring the meaning of the law
> in a vacuum and from constructing generalized legal rules unless the resolution of

6

an actual dispute requires it. But when a court declares that a case is not prudentially ripe, it means that the case will be *better* decided later and that the parties will not have constitutional rights undermined by the delay. It does not mean that the case is not a real or concrete dispute affecting cognizable current concerns of the parties within the meaning of Article III. . . . Prudential ripeness is, then, a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial.

*Id.* at 357 (citations omitted).

### 1.    *Constitutional Ripeness*

Often, the best way to think of constitutional ripeness is as a specific application of the actual injury aspect of Article III standing. The "irreducible constitutional minimum of standing contains three elements": (1) "the plaintiff must have suffered an injury in fact," i.e., "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992) (quotation marks, citations, alterations, and footnotes omitted). Constitutional ripeness, in other words, is really just about the first *Lujan* factor—to say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not "actual or imminent," but instead "conjectural or hypothetical."[5] *See id.* at 560; *see also New*

---

[5] Views such as Judge Leval's concurrence in *Bronx Household of Faith v. Board of Education of City of New York*, 492 F.3d 89, 111 (2d Cir. 2007) (Leval, J., concurring) (agreeing that "[r]ipeness overlaps in some respects with standing," but noting that "the central concerns of ripeness doctrine are somewhat distinct from standing"), are not to the contrary. As Judge Leval noted, constitutional standing and constitutional ripeness are somewhat different in *practice*. To say a party's claims are not ripe acknowledges, at least impliedly, that they someday might be. *See id.* ("The concept of ripeness assumes that the relationship between the parties might at some point ripen into an injury sufficiently direct and realized to satisfy the requirements of Article III standing."). Denying standing is more categorical. *Logically*, however, there is no difference.

*York Civil Liberties Union v. Grandeau*, 528 F.3d 122, 130 n.8 (2d Cir. 2008) ("Standing and

ripeness are closely related doctrines that overlap most notably in the shared requirement that the

plaintiff's injury be imminent rather than conjectural or hypothetical." (quotation marks and

alterations omitted)); *Ross v. Bank of Am., N.A.(USA)*, 524 F.3d 217, 226 (2d Cir. 2008) (because

the ripeness and standing doctrines "overlap," claims that were sufficiently "actual and

imminent" to establish Article III standing also were ripe for adjudication, "not merely

speculative or hypothetical").[6]

Despite the language of *Lujan* and similar cases, however, we assess pre-enforcement

First Amendment claims, such as the ones NOM brings, under somewhat relaxed standing and

ripeness rules.  A plaintiff must allege something more than an abstract, subjective fear that his

rights are chilled in order to establish a case or controversy.  *See Laird v. Tatum*, 408 U.S. 1, 13-

14 (1972).  But a real and imminent fear of such chilling is enough.  As the Eleventh Circuit has

explained, without the possibility of pre-enforcement challenges, plaintiffs contesting statutes or

regulations on First Amendment grounds "face an unattractive set of options if they are barred

from bringing a facial challenge":  refraining from activity they believe the First Amendment

---

From a constitutional perspective, it does not matter whether one case might someday "ripen" into an imminent or actual controversy, and the other might not.  In both scenarios, there simply is no present case or controversy sufficient to satisfy the strictures of Article III.

[6] For this reason, we consider the parties' constitutional standing and constitutional ripeness challenges together.  *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007) ("[S]tanding and ripeness boil down to the same question in this case."); *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 225-26 (2d Cir. 2006), *abrogated on other grounds by Bond v. United States*, 131 S. Ct. 2355, 2361 (2011) ("Because [the] ripeness arguments concern only th[e] shared requirement" that the injury be imminent, "our analysis of [the] standing challenge applies equally and interchangeably to [the] ripeness challenge.  We therefore do not address ripeness separately, but consider it together with, and as part of, the standing inquiry.").

protects, or risk civil or criminal penalties for violating the challenged law. *Fla. League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 459 (11th Cir. 1996).

This distinction explains our holding in *Vermont Right to Life Committee, Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000). In that case, Vermont statutory provisions required "political advertisements" to contain certain disclosures and mandated that expenditures for some "mass media activities" be reported to the state. *Id.* at 379. The plaintiff, a pro-life nonprofit organization, brought suit under 42 U.S.C. § 1983, seeking a declaratory judgment that the provisions were facially unconstitutional under the First Amendment and seeking an injunction barring the defendants, a group of state officials sued in their official capacities, from enforcing the law. *Id.* When it filed suit, the plaintiff had not been charged with violating any of the challenged provisions. *Id.* at 381. The plaintiff believed, however, that its advocacy activities did not comply with the law, and it maintained that it would cease its non-compliant behavior unless the provisions were declared unconstitutional. *Id.* We acknowledged that the usual standing rules applied, but, citing well-established Supreme Court precedent, we also recognized that "[a] plaintiff bringing a pre-enforcement facial challenge against a statute need not demonstrate to a certainty that it will be prosecuted under the statute to show injury, but only that it has an actual and well-founded fear that the law will be enforced against it." *Id.* at 382 (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (quotation marks omitted)). "The alleged danger of the statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." *Id.* (quotation marks and alterations omitted). "When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder," that plaintiff "should not be required to await and undergo a

criminal prosecution as the sole means of seeking relief." *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

In *Vermont Right to Life Committee*, it did not matter that the law at issue imposed only civil, and not criminal, liability. *Id.* ("The fear of civil penalties can be as inhibiting of speech as can trepidation in the face of threatened criminal prosecution."). Nor did it make a difference that the state denied that the plaintiff actually was subject to the challenged law. *Id.* What mattered was that the plaintiff faced a "credible threat" that the law would be enforced against it. *Id.* That was enough to give standing.

This case is no different from *Vermont Right to Life Committee*, and NOM's claims are ripe. Attached to NOM's complaint was an example of a radio advertisement NOM wanted to broadcast in New York:

> Think legalizing same-sex marriage doesn't affect your family?
> . . . .
> Legalizing gay marriage has consequences for kids. Massachusetts schools teach second graders that boys can marry other boys. A California public school took first graders to a same-sex wedding, calling it "a teachable moment."
>
> Kids have enough to deal with already, without pushing gay marriage on them. And it's not just kids who'll face the consequences.
>
> The rights of people who think marriage means a man and a woman will no longer matter: We'll all have to accept same-sex marriage whether we like it or not.
>
> Carl Paladino knows that in these troubled times in New York, we don't have time to push gay marriage on New York families.
>
> This Election Day, vote for Carl Paladi[n]o for governor.
>
> As the election approaches, tell your family and friends to vote for Carl Paladino. He'll stand up for marriage between one man and one woman.
>
> Paid for by National Organization for Marriage

Comparing that proposed advertisement with the plain text of § 14-100.1, which says, among other things, that a "political committee" is an organization working "to promote the success or defeat of a political party or principle, or of any ballot proposal; or to aid or take part in the election or defeat of a candidate for public office," NOM plausibly contends that it would have been a "political committee" under New York law if it had aired its commercials during the fall of 2010.

In holding NOM's claimed injury was "too remote," the district court relied in part on the savings clause of § 14-100.1. It reasoned that the provision exempting "any committee or organization for the discussion or advancement of political questions or principles without connection with any vote or to a national committee organized for the election of presidential or vice-presidential candidates" meant that NOM had a "notable chance" of avoiding enforcement. But NOM's complaint contends, and the advertisements attached to its complaint demonstrate, that it wanted *expressly* to connect its speech to particular candidates and elections. We thus give credence to NOM's assertion that it "fears it is a political committee under New York law," which "chills [NOM] from proceeding with its speech." That is enough to make the complaint ripe.

2.     *Prudential Ripeness*

Having dismissed the case on constitutional ripeness grounds, the district court had no occasion to consider Defendants' prudential ripeness arguments. We consider them briefly.

To determine whether to abstain from a case on prudential ripeness grounds, "we proceed with a two-step inquiry, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Grandeau*, 528 F.3d

11

at 131-32 (quotation marks and citation omitted).[7] "The 'fitness' analysis is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur." *Id.* at 132 (quotation marks and citation omitted). "In assessing this possibility of hardship, we ask whether the challenged action creates a direct and immediate dilemma for the parties." *Id.* at 134.

Assessment of both factors counsels against abstention. Although "the factual record is not yet fully developed," the dispute primarily "presents legal questions and there is a concrete dispute between the parties." *Sharkey v. Quarantillo,* 541 F.3d 75, 89 (2d Cir. 2008). The issues presented have sharpened into a live case which is "fit for judicial decision." *See id.* What future contingencies remain, *see Grandeau*, 528 F.3d at 132, are not determinative of the questions before us. It is true that the New York Board of Elections, in Defendants' words, has made "no *specific* effort . . . to classify NOM as a political committee." But there is nothing in the record to indicate that the Board of Elections must specifically find NOM to be a "political committee" for NOM to meet that definition. Rather, on the face of the statute, the designation "political committee" appears to be self-executing. And NOM's complaint asserts that it meets all the elements of § 14-100.1 to merit such classification. Thus, it appears NOM would have no warning of imminent enforcement by the Board of Elections, beyond NOM's own knowledge that it was violating the law.[8] It is disingenuous for Defendants to insinuate that New York *might* not enforce § 14-100.1 against NOM, when the statute quite clearly applies to NOM's

_____

[7] This two-step inquiry also may bear on the constitutional ripeness analysis. *See id.* at 132 n.9.

[8] At oral argument, we asked Appellees to submit a supplemental letter elaborating on this point. That letter confirms that, on NOM's request, the New York State Board of Elections would have provided an opinion letter indicating whether NOM's activities would classify it as a "political committee." *See* Appellees' Letter, Aug. 30, 2011, at 1. There is no indication, however, that such a letter is *required* before an organization can be labeled a "political committee."

12

activities, at least as NOM alleges them to be, and when Defendants' counsel, at oral argument, stated that the New York Board of Elections currently regulates approximately 11,000 "political committees."

Defendants' contention that NOM failed to describe the "materially similar" situations in which it planned to speak in the future is similarly unpersuasive. For one thing, at the time NOM brought suit, it presented the court with several advertisements it wanted to broadcast *immediately*, not in the future. For ripeness purposes, its future plans are of less relevance.[9] Further, NOM's mere statement that its future speech will be "materially similar" to the 2010 advertisements is sufficiently precise. To the extent the advertisements it provided to the district court render NOM susceptible to the "political committee" definition, similar advertisements in the future probably will too.

Whether NOM will suffer hardship if we withhold our ruling is an even easier question to answer. NOM asserts that it will have to submit to a definition it believes is unconstitutional. If NOM is right on the merits, forcing it to break the law before we will answer the constitutional question "creates a direct and immediate dilemma," and a significant hardship. *Grandeau*, 528 F.3d at 134. There is no prudential reason to abstain.

B.     Mootness

Because NOM's complaint concerns the 2010 election cycle, which has now long passed, NOM must overcome a second procedural hurdle—mootness. Defendants' brief does not address mootness (NOM's does). Federal courts have no constitutional power to consider a moot case, which does not present a live controversy. *See Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 647 (2d Cir. 1998) ("The mootness doctrine is derived from the constitutional

---

[9] They are, of course, relevant for *mootness* purposes. Mootness is discussed *infra* at Section II.B.

requirement that federal courts may only decide live cases or controversies."). We thus have a duty to consider mootness *nostra sponte*. *See Kalson*, 542 F.3d at 286.

Although the November 2010 election is over, this case is not moot, for it falls within the judicially created exception for cases "capable of repetition, yet evading review." *See FEC v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 462 (2007). "The exception applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Id.* (quotation marks omitted); *see also, e.g.*, *Porter v. Jones*, 319 F.3d 483, 490 (9th Cir. 2003) ("Election cases often fall within this exception, because the inherently brief duration of an election is almost invariably too short to enable full litigation on the merits."). This case is like *Wisconsin Right to Life*. NOM's complaint clearly alleges that the organization plans to do "materially similar" advertising in "materially similar situations in the future," and consequently that "New York law will apply to NOM as it does now." NOM's "injury of self-censorship is capable of repetition yet evading review." *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 n.4 (9th Cir. 2003).

C.    Merits

Having determined that NOM's case presents a live controversy that is ripe for consideration, we must vacate the district court's determination that it lacked jurisdiction. Because that conclusion prevented the district court from reaching the merits of NOM's claims, we decline to comment on the substance of NOM's claims in the first instance. As ours is not a court of first review, "when we reverse on a threshold question, we typically remand for resolution of any claims the lower courts' error prevented them from addressing." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1430 (2012); *see, e.g.*, *PDK Labs., Inc. v. United*

14

*States Drug Enforcement Admin.,* 362 F.3d 786, 799 (D.C.Cir.2004) (Roberts, *J.,* concurring in part and concurring in judgment) (stating "the cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further."). We therefore remand this case for further proceedings leaving the initial determination of the merits to the district court.

**III.     Conclusion**

The judgment of the district court dismissing this case is **VACATED**, and the case is **REMANDED** to the district court for further proceedings.

Docket No. 10-4572
National Organization for Marriage v. Walsh

Jon O. Newman, Circuit Judge, dissenting:

The National Organization for Marriage ("NOM"), an advocacy organization, seeks a ruling from a federal district court that New York's definition of a "political committee," see N.Y. Elec. Law § 14-100.1, violates the First Amendment. NOM seeks such a ruling to avoid compliance with various requirements imposed on a "political committee," such as registration, see id. § 14-118, maintenance of records, see id. §§ 14-102, -108, -122, and filing reports of contributions and expenditures, see id. §§ 14-102, -104. Because no New York official has expressed the view that NOM is a "political committee" and the New York State Board of Elections ("Board of Elections") has advised us of its willingness to respond to an inquiry from NOM as to whether the Board would classify NOM as a "political committee," NOM's lawsuit is not now ripe for adjudication, as the District Court correctly ruled, see National Organization for Marriage, Inc. V. Walsh, No. 10-cv-751A, 2010 WL 4174664, at *4 (W.D.N.Y. Oct. 25, 2010). From the majority's contrary ruling, I respectfully dissent.

As the majority recognizes, NOM is obliged to assert "an invasion of a legally protected interest which is...actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of

1

Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotation marks and citations omitted). I recognize that in some circumstances a pre-enforcement challenge may be brought to adjudicate the validity of statutes alleged to violate the First Amendment. <u>See</u>, <u>e.g.</u>, <u>Vermont Right to Life Committee v. Sorrell</u>, 221 F.3d 376 (2d Cir. 2000). I also recognize that a plaintiff intending to engage in conduct arguably proscribed by statute need not subject itself to criminal prosecution or the imposition of civil penalties to test its First Amendment claim. Finally, I also recognize that in some circumstances, a plaintiff's own apprehension that it will be subject to allegedly unconstitutional state law requirements can suffice to permit a pre-enforcement challenge. But such apprehension cannot suffice in circumstances, like those in this case, where the relevant regulatory body (a) has given no indication that the challenged regulations apply to the plaintiff, (b) stands ready to respond to an inquiry as to whether the challenged regulations apply to the plaintiff, and (c) is required to afford the plaintiff notice in the event the body intends to depart from advice that the regulations do not apply. In such circumstances, the plaintiff's fear of adverse consequence cannot be said to be "well-founded," <u>id.</u> At 382.

We recently upheld an as-applied challenge to state regulations alleged to impair First Amendment rights where the

2

relevant regulatory body declined to give pre-enforcement advice that would have clarified the meaning of the regulations. See Hayes v. New York State Attorney Grievance Committee, 672 F.3d 158, 170 (2d Cir. 2012). In the pending case, however, the Board of Elections, responding to our inquiry at oral argument, has commendably advised that it "would respond to a letter questioning whether an entity's activities would classify it as a 'political committee' pursuant to New York Elections Law § 14-100(1)." Letter from Craig R. Bucki, counsel to Defendants-Appellees, to Catherine O'Hagan Wolfe, Clerk of Court, at 1 (Aug. 30, 2011). The Board noted that it has issued formal opinions in reply to inquiries, see, e.g., 1975 N.Y. State Bd. of Elections Opinion # 13, 1976 N.Y. State Bd. of Elections Opinion #5. The Board also noted that it responds to "telephone requests for informal advice as to whether an entity constitutes a political committee." Bucki letter, at 1.

In Vermont Right to Life Committee State officials sought to preclude a pre-enforcement challenge on the ground that they had no intention of enforcing challenged regulations against the plaintiff. 221 F.3d at 383. We properly rejected the State's claim that the plaintiff's fear of suit was not well-founded because "there is nothing to prevent the State from changing its mind." Id. The majority contends that the pending case "is no different from Vermont Right to Life Committee, [slip op. P. __]

3

but that assertion overlooks a crucial difference between that case and ours. Not only does the Board of Elections stand ready to advise NOM whether it is considered to be a "political committee," but the Board recognizes that, in the event that it advises that NOM is not a "political committee," the Board may not change its mind without giving NOM the prior notice required by Williams v. Solafani, 444 F. Supp. 906, 912 (S.D.N.Y. 1978), aff'd sub nom. Williams v. Velez, 580 F.2d 1046 (mem. 1978). Furthermore, if the Board were unreasonably to delay either its response to NOM's inquiry or its notice of a change of mind, that circumstance would surely warrant NOM's prompt return to court. See Hirschfeld v. Board of Elections of City of New York, 984 F.2d 35, 40 (2d Cir. 1993) (prohibiting elections board to change its mind after undue delay). Thus, it is simply not so, as the majority contends, that "NOM would have no warning of imminent enforcement by the Board of Elections, beyond Nom's own knowledge that it was violating te law."[1] [slip op. P. __]

Instead of obliging NOM to inquire of the Board of Elections whether it is a "political committee," the majority returns this case to the District Court for a ruling on NOM's constitutional

---

[1]The majority's footnote 8 observes that an inquiry by NOM to the Board of Elections is not required "before an organization can be labeled a 'political committee.'" Quite so. But the absence of a state law inquiry requirement is entirely irrelevant to whether federal court ripeness requirements oblige a plaintiff to take advantage of an available inquiry procedure before launching a pre-enforcement challenge.

4

claims. That course, and the inevitable appeal, will likely precipitate far-reaching constitutional rulings that would be entirely avoided if the Board of Elections determines, upon a proper inquiry, that it does not consider NOM to be a "political committee."

No doubt NOM would be interested in knowing whether New York would violate the First Amendment _if_ the Board of Elections, _if_ asked, were to determine that NOM was a "political committee," but Federal courts do not sit to satisfy litigants' intellectual curiosity. I respectfully dissent.