19-3353-cv

Village Green at Sayville, LLC v. Town of Islip et al.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2021

(Argued: January 14, 2022                    Decided: August 5, 2022)

Docket No. 19-3353-cv

_____

VILLAGE GREEN AT SAYVILLE, LLC,

*Plaintiff-Appellant*,

v.

TOWN OF ISLIP, THE TOWN BOARD OF THE TOWN OF ISLIP, THE
PLANNING BOARD OF THE TOWN OF ISLIP, ANGIE M. CARPENTER,
STEVEN J. FLOTTERON, TRISH BERGIN WEICHBRODT, JOHN C.
COCHRANE, JR., MARY KATE MULLEN, INDIVIDUALLY AND IN THEIR
OFFICIAL CAPACITY AS MEMBERS OF THE TOWN BOARD OF THE TOWN
OF ISLIP, EDWARD FRIEDLAND, KEVIN BROWN, ANTHONY MUSUMECI,
JOSEPH DEVINCENT, DONALD FIORE, DANIEL DELUCA, MICHAEL
KENNEDY, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITY AS
MEMBERS OF THE PLANNING BOARD OF THE TOWN OF ISLIP,

*Defendants-Appellees*.

_____

Before: POOLER, CHIN, and CARNEY, *Circuit Judges*.

Village Green at Sayville, LLC sued the Town of Islip, its Town Board, its Planning Board, and the members of the Town and Planning Boards, alleging that a pattern of racial, ethnic, and national origin discrimination by the defendants stifled Village Green's effort to build an affordable apartment complex in Sayville, a hamlet in Islip. The United States District Court for the Eastern District of New York (Hurley, *J.*), dismissed the case for lack of subject matter jurisdiction, concluding that Village Green's land-use claims were not ripe under the framework established by *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985), *overruled in part on other grounds by Knick v. Township of Scott*, 139 S. Ct. 2162 (2019). We disagree.

Vacated and remanded.

_____

MARK A. CUTHBERTSON, Huntington, N.Y., *for Plaintiff-Appellant*.

TIMOTHY F. HILL (Lisa A. Perillo, *on the brief*), Messina Perillo Hill, LLP, Sayville, N.Y., *for Defendants-Appellees.*

John R. DiCioccio, Islip Town Attorney's Office (*on the brief*), Islip, N.Y., *for Defendants-Appellees.*

POOLER, *Circuit Judge*:

In 2006, the Town of Islip, New York rezoned a vacant plot of land to allow Village Green at Sayville, LLC, a real estate developer, to build a housing complex Village Green hoped would be accessible to low-income and minority populations. The project languished for the next eight years, however, as the developer struggled to comply with a pair of covenants and restrictions ("C&Rs") that accompanied the rezoning. In 2014, Village Green petitioned the

2

Town Board to remove the C&Rs. In November 2016, after several contentious public hearings and the completion of a number of planning studies, the town supervisor moved for the Town Board to approve the application. But the motion was not seconded, and no vote was held. A month later, a resolution filed with the town clerk deemed the motion to have "fail[ed] for lack of second," App'x at 317, and Islip's town attorney told Village Green that "the Town is treating the failed motion to approve as a denial" of the application, such that "no further proceedings before the Town Board, Planning Board, or any other Town Agency would be held," App'x at 32-33 ¶ 67. Village Green then brought this suit, alleging that the town stifled the project in an unlawful effort to exclude minorities from living in Sayville, the hamlet in Islip where the property is located.

We address today only the narrow issue of ripeness. Federal suits in the land-use context, like this one, are generally not ripe for adjudication until a landowner receives a final, definitive decision on a land-use application. *Williamson Cnty. Reg. Planning Bd. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985), *overruled in part on other grounds by Knick v. Township of Scott*, 139 S. Ct. 2162 (2019). The United States District Court for the Eastern District of

New York (Hurley, *J.*) concluded that the Town Board had not yet reached a final decision on Village Green's application to remove the C&Rs. We disagree. Without taking a position on the merits of Village Green's racial, ethnic, and national origin discrimination claims, we conclude that the dispute is ripe. We therefore vacate the dismissal of this action and remand to the district court for further proceedings consistent with this opinion.

## BACKGROUND

I.    **Factual Background**[1]

The property at issue is 7.29 acres. Around a thousand feet wide and generally level in grade, it has 590 feet of frontage on the south side of Long Island's Sunrise Highway, a major east-west artery ten lanes wide where it abuts

---

[1] Although the town submitted evidence beyond the pleadings in support of its motion to dismiss, the district court did not make findings of fact and looked solely to the allegations in Village Green's complaint in ruling on the motion. This was appropriate because the evidence proffered by the town does not contradict the relevant allegations in the pleadings. *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016). In reviewing this grant of a motion to dismiss for lack of subject matter jurisdiction, we therefore "accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." *Sharkey v. Quarantillo*, 541 F.3d 75, 83 (2d Cir. 2008) (internal quotation marks omitted).

the property. Just north of the property sits the Sayville Motor Inn. To the southeast is a neighborhood of mainly single-family houses.

In February 2006, Islip's Town Board granted Village Green's application to rezone the property from Business One to Residence CA, conditioned on a number of C&Rs, including two that proved controversial: first, that the development could consist only of condominiums owned by dwelling unit owners, not renters—even though a Residence CA zoning designation generally allows rental properties as a matter of right; and second, that the development must be connected to an off-site sanitary treatment plant ("STP"). In December 2006, the town engineer authorized construction of 38 single-family attached condominiums on the property.

For much of the next decade, Village Green struggled to obtain funding and comply with the C&Rs. Connection to an off-site STP proved especially onerous. Reaching the Sayville Commons STP, the only feasible option, would require Village Green to lay approximately 1.3 miles of sewer pipe, and several nearby landowners—including the Sayville Union Free School District and the Town of Islip itself—refused to grant the necessary easements. In the meantime, the town also allocated the Sayville Commons STP's remaining capacity to

another development, foreclosing, in Village Green's view, its ability to comply with the off-site STP requirement.

So Village Green began the process of removing the two C&Rs and clearing a path to development. In May 2014, following pre-submission meetings with the planning department, Village Green petitioned the Town Board to allow it to construct an apartment complex of 64 rental units, with twenty percent set aside as affordable units, with an on-site STP. The Town Board referred the application to the Planning Board, which held a public hearing on November 13, 2014. Local opposition was strong. In addition to expressing concerns that apartments might increase traffic, harm the environment, and diminish property values, several residents questioned whether the development would come to resemble the Sayville Motor Inn, the nearby property—not owned or operated by Village Green—perceived by some as a hotbed of crime, drugs, and prostitution. One resident told the Planning Board that "[w]hen you change the actual demographics of the area, you [degrade] everything that happens in an area with apartments as opposed to single family homes." App'x at 27. Added another: "There are lots of apartments available that are affordable in Sayville. I really don't know why we need any more." App'x at 27. One resident asked, "[i]f they

6

can't rent out the apartments, what do you think is going to happen? They'll go to Section 8." App'x at 28.[2] And another objected that Village Green "keep[s] stressing how lovely the buildings are. . . . But we are not talking about what's on the outside. We're talking about what might be on the inside." App'x at 27.

Eighteen months passed after this hearing before the Planning Board considered a motion to recommend that the Town Board approve Village Green's application. In May 2016, the planning department reported that Village Green had undertaken studies satisfactorily addressing concerns about traffic impacts, wetlands, and property value diminution. Put to a vote, though, the seven-member Planning Board failed to pass the motion: After the vice chairman recused himself, the vote was 3-3 and deemed a "non-action." App'x at 29 ¶ 53.

Village Green again modified its application, now seeking to build only 59 rental units, with half of those set aside for senior citizens. On June 30, 2016, the Town Board held a public hearing. Members of the public again made hostile comments, discussing "Section 8" and "transients," and pledging that

---

[2] The Section 8 program provides federal housing assistance to low-income individuals. *See Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 296 (2d Cir. 1998).

townspeople "will not forget if this project is approved." App'x at 30-31. As one resident recounted:

> As a child, I was born in Brooklyn. I lived in the projects. It was beautiful when we started living there. Gorgeous. But then Section 8 came in. It went from a beautiful area to a war zone. It looked like Iraq. . . . We don't know what type of element is going to be moving into these apartments and what they're going to leave behind . . . [whether there is] going to be any drug activity, crime, prostitution, murder. . . . It's going to be the murder capital of Suffolk [County].

App'x at 16 ¶ 7. The crowd was so vocal that the town supervisor several times admonished people for shouting and at one point threatened to suspend the meeting.

Four months later, on November 3, 2016, the renewed application was on the Planning Board's agenda as a recommendation item; but the Planning Board did not act that day, because, according to Village Green, one of the development project's most outspoken opponents was out of town. Two weeks later—on November 17, 2016—the Town Board placed Village Green's application on its agenda for a vote. A large group of residents opposed to the development attended, although they were not permitted to speak. After presentations by the planning department and Village Green, the town supervisor moved for the Town Board to approve the application. No other Town Board member seconded

the motion, however, and no vote was held. The same night, the Town Board

unanimously approved an application by Renzon Concepcion, another

developer, to modify a similar C&R that had required 30 condominium units to

instead allow 44 rental apartments. Renzon's development was located in the

majority-minority hamlet of Brentwood.[3]

A resolution filed with the town clerk on December 8, 2016 deemed the

motion to approve to have "fail[ed] for lack of second." App'x at 317. A week

later, Islip's town attorney informed Village Green's attorney that "the Town is

treating the failed motion to approve as a denial of the Village Green

Application, and that no further proceedings before the Town Board, Planning

Board, or any other Town Agency would be held." App'x at 32-33 ¶ 67. Village

Green's attorney sent the town attorney a letter the same day summarizing their

conversation and asking for a written response if the town attorney disputed

making those statements. No response came.

Neither the Town Board nor any other town agency has acted on Village

Green's application since 2016.

---

[3] A "majority-minority" community is one "in which minorities make up a majority of the population." *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 588 (2d Cir. 2016).

## II.  Procedural Background

After receiving no response to its letter, Village Green filed two suits. First, in December 2016, it filed an Article 78 action in New York Supreme Court, seeking a declaration that the contested C&Rs were illegal and unenforceable and an order for the town to approve the application and issue the necessary building permits. *See Village Green at Sayville v. Town of Islip*, No. 011060/2016 (N.Y. Sup. Ct.). That action is ongoing.

Village Green's second case is the one before us. In December 2017 the developer filed, and in August 2018 it amended, a federal complaint alleging that the town blocked its housing project to exclude minorities from Sayville. Village Green contends that Islip is highly segregated by race and national origin, with its African-American and Hispanic populations overwhelmingly concentrated in the hamlets of Brentwood, Bay Shore, and Central Islip, while Sayville is over 90% non-Hispanic white and has a much lower foreign-born population than Islip overall; that by requiring C&Rs that allow only owner-occupied condominiums in places like Sayville, the town has prevented construction of the type of affordable and market-rate rental apartments that minorities are disproportionately likely to occupy; that the Town Board frequently grants

10

applications to modify C&Rs to permit rental apartments in majority-minority areas of town like Brentwood, while refusing to do so in predominantly white areas like Sayville; and that, in refusing to modify Village Green's C&Rs, the town unlawfully limited housing opportunities for minorities and families with children, perpetuating ethnic and racial segregation.

Village Green's complaint set forth causes of action under the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(a) (Count One); 42 U.S.C. § 1981 (Count Two); 42 U.S.C. § 1982 (Count Three); the equal protection clause of the Fourteenth Amendment and 42 U.S.C. § 1983 (Count Four); New York Executive Law § 296(5)—New York's FHA equivalent—and § 296(6) (Count Five); substantive due process under the Fourteenth Amendment (Count Six); and the takings clauses of the Fifth and Fourteenth Amendments (Count Seven). The complaint sought a declaratory judgment deeming the defendants' acts unlawful, an injunction directing them to remedy the effects of their discriminatory conduct, compensatory and punitive damages, and attorneys' fees.

In two orders, the district court dismissed each claim for lack of subject matter jurisdiction. The district court principally concluded that Village Green's

claims were not yet ripe because it had not received a final decision on the application to remove the C&Rs, as "the Town Board never voted . . . at the November 2016 meeting," and "neither the Town Board, the Planning Board, nor any other Town agency has taken any action" since then. *Village Green at Sayville, LLC v. Town of Islip*, No. 2:17-cv-7391, 2019 WL 4737054, at *5 (E.D.N.Y. Sept. 27, 2019) ("*Village Green I*"); *id.* at *11 (dismissing the first, fourth, sixth, and seventh causes of action); *see also Village Green at Sayville, LLC v. Town of Islip*, No. 2:17-cv-7391, 2021 WL 230298, at *2, *10 (E.D.N.Y. Jan. 22, 2021) ("*Village Green II*") (dismissing the second, third, and fifth causes of action). The district court also concluded that Village Green failed to satisfy the limited futility exception to the final-decision requirement, which applies if seeking a final decision on a land-use application would be futile. *Id.* at *9; *see also Sherman v. Town of Chester*, 752 F.3d 554, 561-62 (2d Cir. 2014).

This appeal followed.

## DISCUSSION

We are not asked at this stage to assess the merits of Village Green's discrimination claims. The only issue is whether they are ripe for adjudication. "We review *de novo* a district court's determination that it lacks subject-matter

12

jurisdiction on ripeness grounds." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013).

## I.    Ripeness in the Land-Use Context

"To be justiciable, a cause of action must be ripe—it must present a real, substantial controversy, not a mere hypothetical question." *Kurtz v. Verizon New York, Inc.*, 758 F.3d 506, 511 (2d Cir. 2014) (quoting *Walsh*, 714 F.3d at 687). "Ripeness is a doctrine rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005). "At its heart is whether we would benefit from deferring initial review until the claims we are called on to consider have arisen in a more concrete and final form." *Id.* That is, ripeness "is 'peculiarly a question of timing' as cases may later become ready for adjudication . . . ." *Id.* (quoting *Reg'l Rail Reorg. Act Cases*, 419 U.S. 102, 140 (1974)). Our goal is to avoid "entangling [ourselves] in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002), *abrogated on other grounds by Knick*, 139 S. Ct. 2162.

13

This concern about untimely adjudication is especially pronounced in the land-use context. Land-use controversies, despite their ability to generate federal suits like this one, are "matters of local concern more aptly suited for local resolution," *Murphy*, 402 F.3d at 348, and "federal courts should not become zoning boards of appeal," *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 505 (2d Cir. 2011). Accordingly, federal courts adhere to "specific ripeness requirements applicable to land use disputes." *Murphy*, 402 F.3d at 347. *Williamson County* is the foundational case. 473 U.S. 172. There, the Supreme Court held that a claim alleging a Fifth Amendment taking is not ripe until two prerequisites are met: first, that the "government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue" (the final-decision requirement); and second, that the plaintiff has sought just compensation through an available state procedure (the exhaustion requirement). *Id.* at 186, 194.

The Supreme Court has since overruled the exhaustion requirement on the ground that it "impose[d] an unjustifiable burden on takings plaintiffs [and] conflict[ed] with the rest of our takings jurisprudence." *Knick*, 139 S. Ct. at 2167.

In contrast, the final-decision requirement not only remains good law but has been expanded, in this Circuit at least, to "zoning challenges based on substantive due process; First Amendment rights of assembly and free exercise; the Religious Land Use Institutionalized Persons Act of 2000; [] a state analogue to RLUIPA," as well as to "zoning challenges under the [Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*] based on allegations of intentional discrimination." *Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118, 122 (2d Cir. 2014) (citations omitted); *see also Pakdel v. City & Cnty. of San Francisco*, 141 S. Ct. 2226 (2021) (per curiam) (applying *Williamson County*'s final-decision requirement after *Knick*).

Still, the final-decision requirement "is not mechanically applied." *Murphy*, 402 F.3d at 349. "A property owner, for example, will be excused from obtaining a final decision if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile" or "when a zoning agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied." *Id.* Similarly, "a plaintiff need not await a final decision to challenge a zoning policy that is discriminatory on its face, or the manipulation of a zoning

process out of discriminatory animus to avoid a final decision." *Sunrise Detox*, 769 F.3d at 123 (citations omitted).

## II. All of Village Green's Claims Require a Final Decision

Before assessing whether Village Green received a final decision on its application to remove the C&Rs, we must address which of its claims are in fact subject to the final-decision requirement. Cognizant that "[t]he *Williamson County* ripeness test is a fact-sensitive inquiry . . . applicable to various types of land use challenges," *Murphy*, 402 F.3d at 350, we agree with the district court that the requirement applies to each claim.

Village Green's takings, due process, and equal protection claims plainly must satisfy finality. *See Williamson Cnty.*, 473 U.S. at 186 (takings); *Southview Assocs. v. Bongartz*, 980 F.2d 84, 96-97 (2d Cir. 1992) (substantive due process); *Dougherty*, 282 F.3d at 88-89 (equal protection). We further conclude that a final decision is required for Village Green's land-use claims under the FHA, 42 U.S.C. §§ 1981 and 1982, and New York Executive Law § 296.[4]

---

[4] The consensus among lower courts is that, at least for as-applied FHA claims in the land-use context, a final decision is required. *See, e.g.*, *Congregational Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 915 F. Supp. 2d 574, 607 (S.D.N.Y. 2013); *Jenkins v. Eaton*, No. 08-cv-0713, 2009 WL 811592, at *3 (E.D.N.Y.

16

*Sunrise Detox*, our most recent case to address an extension of the final-decision requirement, shows why this is so. Sunrise Detox—like Village Green, a developer—had sought a special permit to establish a drug and alcohol rehabilitation facility as a "community residence" in White Plains. 769 F.3d at 119. After White Plains' Department of Building advised that the proposed facility did not qualify as a community residence under the applicable regulations, meaning that Sunrise would have to "either appl[y] for a variance or appeal[] the determination," Sunrise instead sued the city, alleging discrimination in violation of the ADA. *Id.* Sunrise argued that the final-decision requirement did not apply to "zoning challenges under the ADA based on allegations of intentional discrimination," because intentional discrimination "cause[s] a uniquely immediate injury rendering such claims ripe from the act of discrimination." *Id.* at 121-22 (alterations and internal quotation marks omitted). We disagreed. Because Sunrise principally sought "an injunction blocking the

Mar. 27, 2009); *S&R Dev. Estates, LLC v. Bass*, 588 F. Supp. 2d 452, 460-61 (S.D.N.Y. 2008). Other circuits have held the same. *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Scotch Plains*, 284 F.3d 442, 451 n.5 (3d Cir. 2002); *Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 124 F.3d 597, 602 (4th Cir. 1997); *Oxford House-A v. City of Univ. City*, 87 F.3d 1022, 1024-25 (8th Cir. 1996); *United States v. Vill. of Palatine*, 37 F.3d 1230, 1233 (7th Cir. 1994).

disapproval and authorizing construction of its project," we explained that "[r]egardless of the basis of the claim . . . the relief sought brings the case squarely within the compass of *Williamson County* and its progeny." *Id.* at 123. As in those cases, the zoning review process had to play out before it could "be known whether the allegedly discriminatory [conduct] . . . had any effect at all on Sunrise's application." *Id.* Thus, we held, "a plaintiff alleging discrimination in the context of a land-use dispute is subject to the final-decision requirement unless he can show that he suffered some injury independent of the challenged land-use decision." *Id.*

What we said of Sunrise's ADA claim applies equally to each of Village Green's claims. Village Green is, like Sunrise, "a plaintiff alleging discrimination in the context of a land-use dispute." *Id.* And like Sunrise, Village Green principally seeks an injunction "directing Defendants to take all affirmative steps necessary to remedy the effects of the[ir] illegal, discriminatory conduct." App'x at 44.[5] Finally, once again like Sunrise, Village Green does not allege that it

---

[5] In *Sunrise Detox*, the plaintiff did not seek "compensatory damages from the official who it claims acted out of discriminatory motivation," so we saw no need to address "whether a property owner who claimed that a local official vetoed his or her development project out of hostility based on the owner's race, gender, disability, or the like, in violation of federal statutory or constitutional law, could

suffered an injury independent of the land-use decision—for instance, that the town has any facially discriminatory policies.[6] For each cause of action, Village Green alleges that its rights were violated when the town's "denial of [its] application . . . resulted in dwellings in Sayville being made unavailable to Minorities in the Town." App'x at 38 ¶ 98. It stands to reason that the developer must first prove that we can look to a "final, definitive position" from the town on that application. *See Sunrise Detox*, 769 F.3d at 124. Absent that showing, Village Green's claims cannot be said to have "yet matured to a point that warrants decision." 13B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3532 (3d ed. 2022).

Village Green argues that this Court's ruling in *Mhany Management, Inc. v. County of Nassau* demonstrates that a final decision is not required for its FHA

---

seek immediate recompense in federal court from that official for . . . dignitary or emotional harm . . . even in the absence of a final decision on the development proposal." 769 F.3d at 123. Here, unlike in *Sunrise Detox*, Village Green does seek damages in addition to an injunction. But we need not address the question left open in *Sunrise Detox*, because Village Green's claim for monetary damages does not sound in dignitary or emotional harm and because, in any event, we conclude that Village Green has received a final decision.

[6] *See* App'x at 37 ¶¶ 89-90 (acknowledging the town's "facially-neutral custom, policy, or practice" of "refusing to modify C&Rs that limit development to owner-occupied condominiums or age-restricted rental apartments").

claim. *See* 819 F.3d 581. We disagree. In *Mhany*, we held that developers had standing to pursue claims that Nassau County and the Incorporated Village of Garden City had discriminatorily rezoned parcels of county-owned land to prevent low- and middle-income housing from being built on those sites, in violation of the FHA. *Id.* at 598, 623. We focused on the second and third prongs of the three-part *Lujan* test for Article III standing: whether the injury is "fairly traceable to the challenged action of the defendant," and whether it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 600 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 180-81 (2000)). We concluded that these requirements had been satisfied because the developers had shown that, absent the defendants' challenged conduct, there was a "'substantial probability' that housing with greater minority occupancy would have been built." *Id.* at 600-601 (quoting *Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 363 (2d Cir. 2003)). Our conclusion today is consistent with *Mhany*. The final-decision requirement, and constitutional ripeness generally, are "really just about the first *Lujan* factor"—whether a plaintiff's injury is concrete, particularized, and actual or imminent. *Walsh*, 714 F.3d at 688. Because there was no dispute in *Mhany* that the

20

defendants had made the final decision to rezone the challenged parcels of land, *see* 819 F.3d at 606, that case simply did not address the contours of the final-decision requirement.

### III. This Dispute Is Ripe

Having concluded that Village Green's claims are all subject to the final-decision requirement, we turn to the central issue: Has Village Green received a "final, definitive decision" on its application to remove the C&Rs, or are further proceedings before town agencies necessary for the claims to "arise[] in a more concrete and final form?" *Murphy*, 402 F.3d at 347, 353. Here we part ways with the district court and conclude that this dispute is ripe.

We have characterized *Williamson County*'s "jurisdictional prerequisite" as "condition[ing] federal review on a property owner submitting at least one meaningful application" to the relevant municipal entity. *Id.* at 348. This is principally because it is "virtual[ly] impossib[le]" for us to determine "what development will be permitted on a particular lot of land when its use is subject to the decision of a regulatory body invested with great discretion, which it has not yet even been asked to exercise." *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 739 (1997). Two of our cases make the point clearly. In *Sunrise Detox*, the

21

decision not to pursue the "administrative avenues for relief outlined in the zoning ordinance"—and the fact that Sunrise was advised, in a letter from the Department of Building commissioner, to "either seek a variance or appeal the department's determination to the Zoning Board of Appeals"—prevented us from being able to "'look to a final, definitive position' from the city regarding [Sunrise's] application." 769 F.3d at 121, 124 (quoting *Murphy*, 402 F.3d at 347). "A federal lawsuit at this stage," we explained, "would inhibit the kind of give-and-take negotiation that often resolves land use problems, and would in that way impair or truncate a process that must be allowed to run its course." *Id.* "In light of Sunrise's midstream abandonment of the zoning process . . . its claim [wa]s not yet ripe." *Id.*

Landowner abandonment of the zoning process was even more pronounced in *Murphy v. New Milford Zoning Commission*. The dispute there stemmed from the Sunday afternoon prayer group meetings, often attended by between ten and sixty people, that Robert and Mary Murphy held weekly in their home on a seven-residence cul-de-sac in New Milford, Connecticut. *Murphy*, 402 F.3d at 344-45. After the neighbors complained of congestion and excessive noise, New Milford's zoning commission directed its zoning

enforcement officer ("ZEO") to investigate. *Id.* at 345. The ZEO "visited the Murphys' property on three Sundays and found that from thirteen to twenty cars lined the Murphys' driveway, their rear yard and the cul-de-sac." *Id.* The zoning commission issued an opinion concluding that "the weekly, sizable prayer meetings were not a customary accessory use in a single-family residential area." *Id.* The commission sent the Murphys an informal letter so advising them. *Id.* Two days later, the Murphys sued the zoning commission, to which the ZEO responded with a formal cease and desist order. *Id.* However, instead of "appeal[ing] the cease and desist order to the Zoning Board of Appeals, where they could have sought a variance," the Murphys continued with their federal suit. *Id.* The dispute was not ripe because the Murphys' "fail[ure] to submit a single variance application in this matter . . . depriv[ed] us of any certainty as to what use of the Murphys' property would be permitted." *Id.* at 353.

This case is a far cry from *Sunrise Detox* and *Murphy*. There is no question that Village Green submitted a "meaningful application" to municipal agencies to address its land-use dilemma. *Id.* at 348. Certainly, Village Green did not shirk the "give-and-take negotiation that often resolves land use problems," *Sunrise Detox*, 769 F.3d at 124—even if, in this case, negotiation was evidently fruitless.

Village Green did not sue when, after seven years of trying to comply with the C&Rs, it came to believe that compliance had become impossible. Instead, the developer began the arduous process of modifying the C&Rs. That process began in 2013, with the pre-submission meetings with the planning department; continued in 2014, when Village Green filed its formal application to modify the C&Rs and defended its project during public hearings; took shape over the next two years, when it worked with the planning department on a series of studies on traffic, property values, and wetland issues and modified its application several times to accommodate concerns from residents and the towns; and was set to culminate in November 2016, with a formal motion to approve before the Town Board. Through its compliance with all that the town asked of it, Village Green in no way "impair[ed] or truncate[d] a process that must be allowed to run its course." *Id.*

Of course, submitting a meaningful application is only part of the equation. The municipal entity responsible for the relevant zoning laws must also have an opportunity to commit to a position. *See, e.g.*, *Pakdel*, 141 S. Ct. at 2230 ("Once the government is committed to a position . . . the dispute is ripe for judicial resolution."); *Unity Ventures v. Lake Cnty.*, 841 F.2d 770, 775 (7th Cir. 1988)

24

("A final decision must be demonstrated by a development plan submitted, *considered, and rejected* by the governmental entity." (emphasis added)). It is at this stage that the district court concluded that Village Green's claims were not ripe. The Town Board never took a definitive position, according to the district court, because it never voted at the November 2016 meeting and has not considered the application since then. *See Village Green I*, 2019 WL 4737054, at *5.

We see things differently. It would no doubt be easier for us to conclude that Village Green received a final decision had the Town Board done what the developer asked it to do: vote publicly, yes or no, on the application. The parties seem to agree a no-vote on November 17, 2016, would have ripened the dispute. But because the Town Board declined to give its position this way, we must assess the more unusual route it did take: first, noting in an official resolution that the "motion to approve fails for lack of second," App'x at 317; then apparently choosing to "treat[] the failed motion to approve as a denial of the application" and promising that no town agency would hear anything further on the matter; App'x at 32-33 ¶ 67; and finally, true to that promise, scheduling no further proceedings on the application in the almost six years since.

We conclude that, through this sequence of events, the Town Board demonstrated its "arriv[al] at a definitive position on the issue that inflict[ed] an actual, concrete injury" on Village Green. *Williamson Cnty.*, 473 U.S. at 193. Consider first the resolution filed with the town clerk on December 8, 2016. In full, it states:

> WHEREAS, an application has been filed by Village Green at Sayville, LLC ("the applicant") with respect to the property located at 0 Sunrise Highway, Sayville and referred to on the Suffolk County Tax Map as 0500-258.00-03.00-001.000); and
>
> WHEREAS, the applicant seeks a modification of deed covenants and restrictions associated with TC 4726 in order to construct 59 apartment[s] (58 rental apartments and 1 superintendent apartment) instead of 38 single family attached dwellings, and
>
> WHEREAS, a public hearing was held before the Town Board on June 30, 2016, at which time decision was reserved; and
>
> WHEREAS, the item was scheduled for a decision before the Town Board on November 17, 2016.
>
> NOW, THEREFORE, on motion by Supervisor Angie Carpenter to grant the application, be it
>
> RESOLVED, that the motion to approve fails for lack of second.

App'x at 317.

The resolution bears many indicia of finality. It acknowledges that, while the Town Board "reserved" its decision on the application on June 30, the application was "scheduled for a decision" on November 17. The "RESOL[UTION]" that follows—that the "motion to approve fails"—can naturally be read as constituting that decision. Unlike at the June 30 meeting, at which the Town Board passed a "motion to reserve decision and ask[ed] that the Planning Board review this application again," App'x at 281, this resolution does not contemplate future proceedings. It does not reschedule the vote. It gives no further instructions to Village Green. In other words, it offers no indication that the Town Board intended its denial for lack of second to be any less final than a no-vote would have been.

Village Green's conversation with the town attorney—who serves as "legal counsel to the Town of Islip [and] the Town Board"[7]—reaffirms these observations. The town attorney told Village Green that the failed motion was a

_____

[7] *See Town Attorney*, Town of Islip, https://www.islipny.gov/departments/town-attorney (last visited Aug. 4, 2022). A court may take "routine[]" judicial notice of "documents retrieved from official government websites." *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015); *see Cangemi v. United States*, 13 F.4th 115, 124 n.4 (2d Cir. 2021) (taking judicial notice of agency website).

denial of the application and that "no further proceedings . . . would be held." App'x at 32-33 ¶ 67. The town attorney then failed to respond to a letter from Village Green asking if he disputed having said this. Taking these events together, it was far from "merely speculative" that Village Green's application had failed. *See Sunrise Detox*, 769 F.3d at 122. To the contrary, other than by simply voting—as Village Green repeatedly asked it to do—the Town Board could not have made its position any clearer.

The district court faulted Village Green for citing no "relevant binding precedent suggesting that [the town attorney's] utterance, such as it may be, constitutes a final decision, or is otherwise binding on the Town Board." *Village Green I*, 2019 WL 4737054, at *5. This criticism misses the mark. It is true that, ordinarily, a town attorney will "not have the power to bind [a] Zoning Board with regard to" a land-use application. *Carbone v. Town of Bedford*, 534 N.Y.S.2d 211, 212 (2d Dep't 1988). But Village Green asserts not that the town attorney denied its application on his own authority, but merely that he conveyed the Town Board's position. We cannot fathom why Village Green should now be penalized for having believed him. Nor do we agree with the district court that the Town Board's failure to act since November 2016 weighs in the defendants'

28

favor. The reason there would be "no further proceedings," per the town attorney, was that the application had been denied. App'x at 32 ¶ 67. That the Town Board kept its word bolsters, not undermines, its decision's finality.[8]

Ultimately, we need not speculate why the Town Board would decide to deny the application without a formal vote and forswear further public proceedings. It suffices to say that, taking as true the material factual allegations in the complaint—as at this stage we must—such a decision was made. If a dispute can ripen when a municipal entity uses "repetitive and unfair procedures" to *avoid* a final decision, *see Sherman*, 752 F.3d at 563, it surely ripens when, as here, the entity makes plain that it has *reached* a decision that, by all accounts, it intends to be final. Because the rejection of Village Green's application inflicted "a 'concrete and particularized'" injury, not one that is

---

[8] The town's position on appeal further supports our conclusion that a failed motion to approve can serve as a final decision: the town maintains that the Town Board "has complete discretion in considering [Village Green's] Application and *may even refuse to consider it if it so chooses*." Appellees' Br. at 7 (emphasis added).

"merely speculative and may never occur," *Sunrise Detox*, 769 F.3d at 122

(citations omitted), we conclude that Village Green's claims are ripe.[9]

## CONCLUSION

For the reasons above, we vacate the district court's judgment and remand

for further proceedings consistent with this opinion.

---

[9] Because Village Green received a final decision on its application to remove the C&Rs, we need not address its alternative claim that "[s]eeking a final decision would [have been] futile." *Sherman*, 752 F.3d at 563.